In re CHATEAUGAY CORPORATION, Reomar, Inc., The LTV Corporation, et al., Debtors.

LTV AEROSPACE AND DEFENSE COM-PANY, Vought Industries, Inc. and Vought International, Inc., Plaintiffs,

v.

THOMSON–CSF, S.A. and VT Missile Company, Defendants and Counterclaim Plaintiffs,

v.

The LTV CORPORATION, LTV Aerospace and Defense Company, Vought Indus-tries, Inc. and Vought International, Inc., Counterclaim Defendants.

Bankruptcy Nos. 86 B 11270 (BRL) to 86 B 11334 (BRL), 86 B 11402 (BRL) and 86 B 11464 (BRL).
Adv. No. 92–9531A.

United States Bankruptcy Court, S.D. New York.

Aug. 23, 1995.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for debtors; Myron Kirschbaum, Scott M. Berman, Deborah S. Lewis, Robert Grass, Edward B. Johnson, of counsel.

Shearman & Sterling, New York City, for Thomson–CSF, Inc.; George Wade, Alan S. Goudiss, Kathryn L. Tabner, Molly Dillon, of counsel.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BURTON R. LIFLAND, Chief Judge.

This adversary proceeding arises out of the attempted acquisition of the assets of LTV Aerospace and Defense Company's ("LTVAD") missiles division by Thomson–CSF, S.A. ("Thomson–CSF") and VT Missile Company (together with Thomson–CSF, "Thomson"). Previously, LTVAD moved for summary judgment with respect to several claims it asserted against Thomson in the adversary proceeding including, *inter alia*, breach of this Court's order approving the asset purchase agreement (the "Asset Purchase Agreement") ("Claim 1"); breach of the Asset Purchase Agreement ("Claim 2"); request for turnover of a $20 million dollar reverse break-up fee ("Claim 3"); and dismissal of counterclaims asserted by Thomson, which included, *inter alia*, breach of contract ("Count 1"); breach of warranties ("Count 2"); fraud and negligent misrepresentation ("Count 3"); lost profits and other consequential damages due to LTVAD's breaches of contract ("Count 4"); right to terminate ("Count 5"); recovery of fees and expenses ("Count 6") and unjust enrichment ("Count 7"). After reviewing "voluminous" submissions, this Court, in a June 21, 1993 decision titled *LTV Aerospace and Defense Co. v. Thomson CSF, S.A. (In re Chateaugay Corp.)*, 155 B.R. 636 (Bankr.S.D.N.Y.1993) (hereinafter referred to as *"LTV Aerospace "*) granted LTVAD's motion for summary judgment on Counts 2 and 3 of Thomson's counterclaims and granted LTVAD's motion to dismiss Counts 4 through 7 of Thomson's counterclaims. However, this court denied LTVAD's motion for summary judgment on its affirmative reverse break-up fee claims concluding that such claims could not be resolved in the context of summary judgment without reference to Thomson's breach of contract counterclaim. Specifically, this court found that LTV's entitlement to the reverse break-up fee could not be severed from the factual issue of whether LTV's efforts in assisting Thomson in procuring necessary governmental clearances were reasonable. The following decision addresses these outstanding claims.

A seven day trial (the "Trial") was held at which LTVAD, in support of its breach of contract claim to recover the reverse break up fee, contended that under the terms of the Asset Purchase Agreement, the reverse break up fee became payable July 28, 1992, the day Thomson informed LTVAD that it regarded the Asset Purchase Agreement as "terminated" thereby indicating its determination not to proceed to closing under the Agreement. Thomson, in support of its counterclaims for breach of contract and request for a declaration that the reverse break up fee is not owed, contended at the Trial that LTVAD failed to perform its obligations

pursuant to the terms of the Agreement and therefore is not entitled to payment of the fee.

Having considered the full record and weighed all of the evidence adduced at the Trial, including live and deposition testimony of more than twenty witnesses and more than 200 exhibits, and keeping in mind that a court should not blindly accept findings of fact and conclusions of law proffered by the parties, and having conducted an independent analysis of the law and the facts, this Court makes the following findings of fact and conclusions of law, in accordance with Rule 52 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. *See St. Claire's Hospital and Health Center v. Insurance Company of North America (In re St. Claire's Hospital and Health Center)*, 934 F.2d 15 (2d Cir.1991) (citing *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964)).

## I. *BACKGROUND*

1. On or around July 26, 1986, LTVAD, Vought Industries, Inc., Vought International, Inc. and The LTV Corporation (collectively, "LTV") each filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). Throughout the chapter 11 cases, LTV remained in possession and control of its businesses and property pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Plans of reorganization for LTV were confirmed on May 26, 1993 and became effective on June 28, 1993.

2. Prior to the sale of its assets on August 31, 1992, LTVAD, operating through its aircraft and missiles divisions (respectively, the "Aircraft Division" and the "Missiles Division"), was a manufacturer of military and commercial aerospace and defense products. Approximately ninety eight percent (98%) of the Missiles Division's business derived either directly or indirectly from contracts with the United States armed services. Of that business, the vast majority related to contracts with the United States Army.

3. In early 1991, LTV determined, with the advice and assistance of its investment bankers, to sell LTVAD. LTV had determined that selling LTVAD was LTV's best, and perhaps only, available means of raising the cash necessary to emerge from chapter 11 as a viable business enterprise. In May 1991, LTV publicly announced its intention to market the assets of LTVAD.

4. In connection with soliciting prospective bidders, LTV's investment bankers prepared descriptive materials which were sent to numerous potential domestic and foreign purchasers. Additionally, LTV afforded interested parties access to a data room that contained information on LTVAD's businesses, including copies of LTVAD's primary military contracts. Attached to each contract was a Form DD–254 which indicated the security clearances necessary to perform the particular contract. These contracts and Forms were inspected by interested parties, including Thomson.

5. Bids for all or part of the assets of LTVAD were received from a number of United States and foreign entities including Vought Corporation, a joint venture formed by Martin Marietta Corporation ("Martin Marietta") and Lockheed Corporation ("Lockheed"), and Thomson–CSF.

6. Thomson–CSF is a sophisticated electronics and aerospace products manufacturer, incorporated under the laws of France. Thomson–CSF is also a leading manufacturer of military defense systems and components. Thomson, S.A., a corporation wholly owned by the government of France, owns 58% of the outstanding shares and 75% of the voting shares of Thomson–CSF. VT Missile Company, a Delaware corporation, is a wholly-owned subsidiary of Thomson–CSF and was created by Thomson–CSF as its acquisition vehicle for the Missiles Division.

7. Thomson–CSF and its subsidiaries have for many years manufactured or assisted in the manufacture of United States' or other North Atlantic Treaty Organization ("NATO") members' defense products or systems, including the VT–1 Missile system, a system Thomson–CSF has manufactured in conjunction with LTV. Thomson–CSF sells

its products, including its defense products, in France, as well as in a wide array of European and Asian countries, and to some extent in the United States. Thomson–CSF has, in other instances, attempted to acquire the assets of other United States military defense contractors. In 1988, Thomson–CSF attempted to acquire the assets of the Ocean Defense Corporation, known as Bendix–Oceanics, but was informed by the United States Navy that due to the extremely sensitive nature of Bendix–Oceanics work for the Navy, the applicable security regulations and restrictions would not permit the acquisition contemplated by Thomson–CSF and thus, the acquisition was terminated. Thomson–CSF is a sophisticated player in transactions involving security issues. As stated by Thomson's counsel, "Thomson is experienced not just in France, but has ... significant government [contracts] in this country. It knows what it is about with respect to dealing with the U.S. government and with the Department of Defense." *See LTV Aerospace,* 155 B.R. at 643 (citing April 9, 1992 Transcript at 381).

8. In addition to providing access to a data room containing primary military contracts and Form DD–254s, LTVAD made presentations to interested parties including Thomson during the summer of 1991 regarding, *inter alia,* security obstacles facing foreign owners and the level of LTVAD revenues derived from contracts involving classified information.

9. On February 25, 1992, LTV entered into an agreement for the sale of substantially all of the assets of LTVAD to the Vought Corporation (the "Vought Agreement").

10. On April 1, 1992, a hearing was held before this Court to consider LTV's application for approval of the Vought Agreement.

11. At the April 1 hearing, Thomson and The Carlyle Group ("Carlyle"), a merchant banking firm headed by former Secretary of Defense Frank Carlucci, submitted to the Court coordinated bids for the Missiles and Aircraft Divisions, respectively.

12. The April 1 hearing was continued to April 8, 1992 so that LTV and its creditors could consider the bids submitted by Thomson and Carlyle.

13. The hearing on LTV's application for approval of the Vought Agreement resumed on April 8, 1992, and continued through April 10, 1992. Throughout the April 8–10 hearing, LTV favored approval of the offer submitted by the Vought Corporation, primarily on the ground that it was concerned that Thomson would be unable to obtain the U.S. Government approvals which were conditions of Thomson's obligation to close, due to the U.S. national security issues associated with the Thomson offer.

14. At the April 8–10 hearing, Thomson's counsel and its officers expressed full confidence that Thomson would be successful in procuring the U.S. Government approvals necessary to satisfy its conditions of closing. This confidence was expressed despite having been made aware of the government's view and concern that approximately 75–80% of LTVAD's revenues derived from contracts requiring access to proscribed information known as "Communications Security Information" ("COMSEC").

15. This Court found that there were grounds for significant concern with respect to Thomson's ability to obtain the necessary approvals to satisfy Thomson's closing conditions. *See, LTV Aerospace,* 155 B.R. at 643–644. Nevertheless, LTV's creditor constituencies agreed during the course of the proceedings that they were willing to support Thomson, and risk the possibility that the sale would not close, if Thomson would agree to a substantial reverse break-up fee. *Id.* Mr. Carlucci had informed Thomson by letter dated March 8, 1992 that a substantial reverse break-up fee would likely be needed to persuade LTV's creditors to support a Thomson bid. The reverse break-up fee was intended to compensate LTV and its creditors for the risk that Thomson might not close due to its inability to obtain the necessary government approvals. *Id.*

16. On April 10, the Court approved the sale of the Missiles and Aircraft Divisions to Thomson and Carlyle, respectively. Thomson agreed in open court to pay a $20 million reverse break-up fee to LTV in the event Thomson did not close due to its inability to

obtain the necessary government approvals. The reverse break-up fee was a significant factor in the Court's decision to approve the sale to Thomson and in the creditors' decision to support such a sale. *Id.*

17. On April 21, 1992, Thomson signed the Asset Purchase Agreement. On the same day this Court entered an order (the "Sale Order"), granting LTV's application for approval of the sale of the Missiles Division and approving the Asset Purchase Agreement between Thomson and LTV pursuant to sections 105, 363 and 365 of the Bankruptcy Code. The application for the Sale Order was a core proceeding. The Sale Order attaches a copy of the Asset Purchase Agreement between LTV and Thomson which is incorporated by reference. Section 6.06 of the Asset Purchase Agreement approved by the Court provided for payment of the $20 million reverse break-up fee agreed upon in open court. Pursuant to the Sale Order, this Court retained jurisdiction over Thomson and LTV "to implement and enforce the terms and provisions of this Order and the Agreement, including any dispute, action, or restriction relating to the Purchased Assets...." *See,* Sale Order at 11.

## II. LTV EXERTED REASONABLE EFFORTS TO CONSUMMATE THE SALE OF THE MISSILES DIVISION TO THOMSON

18. As of April 10, 1992, LTV understood that its future as an enterprise depended upon its ability to emerge from chapter 11 as a viable company as quickly as possible. LTV had previously determined that the best way for it to do so was to sell LTVAD's assets for as much as possible. Martin Marietta and Lockheed had withdrawn their bid, declaring that they had no intention of resubmitting a bid for LTVAD. Thus, as of April 10, 1992, LTV had only one available way to sell LTVAD's assets—to consummate the Thomson/Carlyle transactions. Although LTV had serious and well-founded concerns as to whether Thomson could close, LTV understood that it was in its best interests for the Thomson/Carlyle transactions to be consummated and for LTV to receive $450 million. If Thomson failed to close, LTV would receive only $20 million and it had no other ready purchaser for LTVAD.

19. David Hoag, LTV's Chief Executive Officer and the person primarily responsible for LTV's future, was pleased with the amount of the Thomson/Carlyle offer and focused on closing the transaction. Immediately after this Court approved Thomson's bid, Messrs. Hoag and Julian Scheer, Senior Vice President for Corporate Affairs of LTV, discussed a plan of action to assist Thomson in consummating the acquisition of the Missiles Division. Messrs. Hoag and Scheer also discussed a press release demonstrating LTV's support of the Court's decision.

20. The press release, which was issued on April 10, widely disseminated and picked up by the major newspapers and business publications, stated:

> We are pleased the long and arduous bidding process is completed. It moves the company an important step in the direction of completing its chapter 11 reorganization. The court weighed all of the complex issues involved in the sale and determined that a sale to Thomson and Carlyle is in the best interests of LTV's creditors who were unanimous in their support of the Thomson–Carlyle bid. We support the court's decision and will work to achieve necessary approvals and a closing of the sale at the earliest possible time.

The stated purpose of the press release was to inform all of LTV's constituents of where LTV was on this matter because LTV believed that its employees, customers, vendors and the government all needed to know what LTV's position was on the sale.

21. After issuing the April 10 press release, Mr. Scheer committed to writing the plan of action that he and Mr. Hoag agreed upon on behalf of LTV in order to do everything possible to assist Thomson in consummating the transaction. LTV's plan of action was summarized by Mr. Scheer as:

· Support of the Judge's decision.

· The company can operate successfully under the ownership arrangement if approved.

· On the question of foreign ownership, Exon–Florio[1] sets a procedure and that is an issue that must be decided by those charged with that responsibility.

· The company wants the Thomson–Carlyle sale to go through.

22. LTV's plan of action set forth by Mr. Scheer also included cooperating fully in moving the Exon–Florio process forward as quickly as possible, without opining on national security issues which were outside LTV's area of expertise.

23. Mr. Scheer sent this plan of action to Mr. Hoag, who reviewed it and agreed with it. Mr. Hoag then immediately turned to implementing the plan, beginning with a staff meeting in Dallas attended by Mr. Scheer; James Mr. Powers, Chief Financial Officer of LTV; K.C. Caldabaugh, Vice President and Treasurer of LTV; Emmett Smith, LTV General Counsel and Richard Boyle, President and Chief Executive Officer of LTVAD. At this meeting, Mr. Hoag stressed the importance of the Thomson deal, issued assignments, and made certain there would be no misunderstanding about LTV's support for the deal.

24. Subsequently, Mr. Hoag made sure that all employees understood LTV's role in the process and communicated frequently to his subordinates that LTV should provide the government with all information requested, assist Thomson in meeting with government officials and advise Thomson on public relations. Mr. Hoag had frequent conversations with Mr. Boyle to make sure that he and the LTVAD people were delivering on the process as had been agreed to by LTV. Mr. Hoag was also regularly apprised of developments by Mr. Scheer in telephonic and written communications.

25. On April 22, 1992, LTV again publicly declared its support for the sale and its intention to work with Thomson to obtain the necessary government approvals. To that

end, Thomson, Carlyle and LTV issued a joint press release that day, in which LTV stated, in essence, that it was working closely with Thomson and Carlyle to complete the transaction. This press release was widely disseminated and quoted in major newspapers and business publications.

26. The position outlined in LTV's press release and plan of action was communicated directly to Missiles Division employees. In his message to Missiles Division employees, Mr. Boyle stated:

We're relieved that the long and arduous bidding process is completed and we will, of course, support the Court's decision and move ahead to close the sale at the earliest possible time.

27. Mr. Scheer, who had 30 years of public relations, government relations and communications experience in Washington, D.C., was given primary responsibility to work with Thomson in Washington as the "point man" and "quarterback" to help Thomson take the steps necessary to enable it to close the deal.

28. Following this Court's approval of the sale to Thomson, LTV's representatives repeatedly communicated to Thomson LTV's desire and intent to cooperate with and assist Thomson in consummating its acquisition of the Missiles Division. In fact, Mr. Hoag invited James Bell, President and Chairman of Thomson–CSF, Inc., to contact him directly should Thomson encounter any problems with respect to cooperation from LTV.

29. Consistent with its stated position, LTV expended an extraordinary amount of time and effort to help to facilitate the consummation of Thomson's acquisition of the Missiles Division, from the time the Court approved Thomson's bid until Thomson terminated the Asset Purchase Agreement. These efforts were continuous and spanned several arenas, including: (i) efforts to accomplish the tasks necessary to close by July

---

1. The Exon–Florio amendment was enacted as part of the Omnibus Trade and Competitiveness Act of 1988. *See* Pub.L. No. 100–418, 102 Stat. 1107, 1425–26 (1988) (amending Title VII of the Defense Production Act of 1950, 50 U.S.C.App. § 2158, *et seq.*). "The principal purpose of [Exon–Florio] is to authorize the President to

suspend or prohibit any … acquisition … by or with a foreign person, of a person engaged in interstate commerce in the United States when, in the President's view, the foreign interest exercising control over that person might take action that threatens to impair the national security." 31 C.F.R. § 800.101 (1992).

31, 1992; (ii) efforts to assist Thomson in negotiating an acceptable security arrangement with the United States Department of Defense (the "DOD"); (iii) efforts to assist Thomson in obtaining a favorable recommendation from the Committee on Foreign Investment in the United States ("CFIUS"); and (iv) efforts to counter opposition to Thomson's acquisition in Congress.

### A. *Missiles Division Efforts To Accomplish The Tasks Needed To Close The Sale To Thomson*

30. After Thomson's bid was approved, a number of complicated and time-consuming tasks needed to be completed before the deal could close. These tasks included:

(a) Negotiating agreements, or contract "novations," with the Missiles Division's customers to substitute Thomson as the contractor under the Missiles Division's contracts. This process involved hundreds of Missiles Division contracts. This was a document-intensive and time-consuming process that had to be accomplished in accordance with detailed government regulations (*see* 48 C.F.R. § 42.1200 *et seq.*) and requirements.

(b) Structuring and formulating with Thomson and Carlyle an asset separation agreement which would separate the assets of the Missiles Division from those of the Aircraft Division. Since the two Divisions had a significant number of shared facilities and personnel, each of the shared assets had to be identified, and either disposed of or assigned to one of the Divisions, with arrangements in some cases for the other to continue to use the asset.

(c) Interfacing with Thomson on business decisions during the period before closing under Article V of the Asset Purchase Agreement, which gave Thomson the right to approve, *inter alia*, the purchase or sale of any substantial assets, transactions involving real property, the incurrence of any substantial liability, capital expenditures, certain compensation arrangements with LTV officers, directors or employees, contract bids and contract amendments.

(d) Transferring hundreds of permits and licenses, assigning real estate leases, and resolving various tax and environmental issues.

31. Dr. Felix Fenter, the President of the Missiles Division, assembled 15 teams of employees to complete these tasks. Bob Smith, the Missiles Division Director of Contracts, and twelve other Missiles Division employees were designated to lead these teams. Mr. Smith was designated the overall team leader. Missiles Division personnel were instructed to cooperate with the team leaders and the committees that they formed. The fifteen transition teams were responsible for more than one hundred tasks that had to be accomplished prior to closing.

32. Daniel Hagler, general counsel of LTVAD, was appointed to head one of the transition teams and to ensure that the entire company was working towards closing the deal. Mr. Hagler and his staff spent nearly 100% of their time trying to close the Thomson deal, including nights and weekends. Mr. Hagler and his staff worked on the contract novations; the asset separation agreement; assignments and transfers of permits, licenses, and leases; and the various tax and environmental issues. Mr. Hagler and his staff also counseled other departments on what had to be done and made sure that every team leader "got done what they had to get done." (Hagler Transcript at 436).

33. After designating the team leaders, LTVAD management compiled detailed charts to assign tasks to the appropriate team leader to ensure that all of the tasks needed to close the sale to Thomson would be completed by the anticipated closing date of July 31, 1992. These charts were circulated weekly to keep track of each of these tasks, who was responsible for completing each task and the progress that had been made towards completion of each task.

34. In addition, management groups were formed at the LTVAD corporate level and in the Missiles Division consisting of senior LTVAD and Missiles Division personnel. These management groups were responsible for ensuring that each task was completed.

35. Thomson assigned Guy Darrieus as its permanent representative at the Missiles Division during this transition period. Missiles Division employees worked with Mr. Darrieus to accomplish the necessary tasks for closing.

36. In his capacity as the Missiles Division's transition team leader, Mr. Smith met with Mr. Darrieus two to three times a week to obtain approval, pursuant to Article V of the Asset Purchase Agreement, for the ongoing business that the Missiles Division was conducting.

37. LTVAD staff and Missiles Division personnel worked thousands of hours to complete the many tasks necessary to close the Thomson transaction. Through these efforts, LTV was in position to close the transaction by July 31, 1992. In fact, Thomson's representatives acknowledged the cooperation they received from LTV in accomplishing these tasks, including the cooperation they received from Mr. Boyle.

**B. *LTV's Efforts To Assist Thomson In Negotiating An Acceptable Security Arrangement With The DOD***

**i. *Missiles Division Personnel Provided Thomson With Information Crucial To The Presentation Of Thomson's Position To The DOD***

38. Foreign companies seeking to acquire United States defense contractors require various governmental approvals, including the approval of the DOD [2] and ultimately approval by the President pursuant to the Exon–Florio Amendment.

39. Prior to this Court's approval of its bid for the Missiles Division, Thomson had developed a proposal for an Special Security Agreement ("SSA"), designed to allow Thomson to maintain management control over the Missiles Division. Under an SSA, a foreign company can operate a U.S. based subsidiary provided that controls are in place which ensure that only properly cleared U.S. citizens are exposed to information that implicates national security.

40. However, prior to this Court's approval of Thomson's bid for the Missiles Division, Thomson learned from representatives of the Army that a large percentage of the Missiles Division's contracts required access to Communications Security Information ("COMSEC") and other categories of Proscribed Information.[3] The DOD informed Thomson in official correspondence that Thomson would not be granted an SSA if contracts were in place at the Missiles Division that required access to Proscribed Information.

41. As discussed in further detail below, the DOD repeatedly told Thomson that the DOD had determined that Thomson would have to agree to a proxy agreement or a

---

**2.** Under regulations promulgated by the DOD, every company that performs U.S. Government contracts which require access to classified information, must receive a Facility Security Clearance. However, a company that is subject to foreign ownership, control or influence ("FOCI") cannot perform classified military contracts unless steps are taken to insulate the foreign ownership.

DOD regulations provide foreign acquirors methods to sufficiently minimize the effect of FOCI, such that the affiliate may be permitted to obtain and maintain a facility clearance, obtain access to classified information and participate in classified DOD work.

Of the various methods, the least restrictive with respect to the foreign owner's management control of the U.S. affiliate is the Special Security Agreement ("SSA"). Under an SSA, the foreign company can operate the U.S. based subsidiary but must set up controls that ensure that only properly cleared U.S. citizens are exposed to information that implicates national security. In order for the company to obtain an SSA, the Office of the Secretary of Defense and the military services whose contracts are involved must make a determination that issuance of an FSC to the company under FOCI will serve the national interest ("National Interest Determination" or "NID"). *See LTV Aerospace,* 155 B.R. at 641, n. 4–5.

**3.** There are three general categories of classified information: "Confidential," "Secret" or "Top Secret." Within each general category, certain categories of information access to which may be necessary in order to perform a contract are also classified. The information categories include: "Top Secret," "Communications Security Information," ("COMSEC"), "Restricted Data," "Special Access Program Information" and "Sensitive Compartmented Information" (collectively, "Proscribed Information"). *See, LTV Aerospace,* 155 B.R. at 642 n. 5–6.

voting trust instead of an SSA.[4] LTV suggested to Thomson, on many occasions, that it agree to the security mechanism that the DOD was suggesting, and not insist on an SSA. Carlyle representatives were of the same view. Nonetheless, Thomson continued to press for an SSA, and LTV supported its efforts.

42. Within a week after the Court's approval of the Thomson/Carlyle transactions, meetings were set up and steps were taken to begin to provide Thomson with the information that it believed it would need in order to meet the closing deadline, including information to help Thomson deal with the issue of Proscribed Information necessary to perform Missiles Division contracts.

43. Meetings between Thomson and LTV took place at the Missiles Division's facility in Grand Prairie, Texas throughout the week of April 20, 1992 (the "April 20–24 Meetings"). Marcia Madsen, the Thomson attorney in charge of presenting Thomson's SSA proposal to DOD decision makers, and Mr. Bell, among others, represented Thomson at the meeting. LTV made available those individuals at LTVAD who could best assist Thomson with the issues that it had identified, including Jay Musselman, the Missiles Division's senior program executive, and Mr. Smith—both of whose presence Thomson had specifically requested—and program management personnel from each of the Missiles Division's most significant contracts.

44. At the outset of the meetings, Thomson representatives outlined the structure of the SSA that they allegedly had negotiated with the Defense Investigative Service ("DIS"),[5] with which Missiles Division personnel were not familiar.

45. During the early part of the April 20–24 Meetings, Thomson requested that the Missiles Division provide Thomson's representatives with a list of all Missiles Division contracts and the related DOD Forms DD–254, which identify the security classification for each particular contract. The requested contract information was provided to Thomson representatives on April 20 and 21, 1992, although Thomson, and all other prospective bidders, had access to a data room containing such information, presumably for purposes of independent due diligence and investigation, prior to this time and certainly prior to the signing and approval of the Asset Purchase Agreement.

46. In addition, at Thomson's request, the Missiles Division's program and security personnel immediately conducted a review of all of the Missiles Division's contracts in an effort to determine the extent of the use of COMSEC and other Proscribed Information in those contracts.

47. The results of that review were presented to Thomson on April 24, 1992. On that day, Missiles Division program managers and program management personnel, under the supervision of Mr. Musselman, made detailed presentations to Thomson's representatives with respect to the security classifications and requirements of each of the Missiles Division's contracts—including COMSEC, and the manner in which COMSEC is utilized in each such program. Among the contracts discussed at the meeting were the Missiles Division's most significant contracts, including the Army's Multiple Launch Rocket System ("MLRS") program; the Army Tactical Missiles System ("ATACMS") program, the Extended Range Intercept Technology ("ERINT") program

---

4. The voting trust and proxy agreement are more restrictive alternatives to an SSA. The voting trust and the proxy agreement, unlike the SSA, are designed to prevent the foreign entity from exercising management control over the DOD contractor.

Under a voting trust, a foreign owner is insulated from a cleared facility by transferring legal title to its stock holdings to U.S. citizen trustees who assume responsibility for management of the company. *See,* Industrial Security Regulations at § 2–205(b).

Under a proxy agreement, legal title to the stock remains with the foreign owner but voting rights

of the foreign owner's stock are irrevocably conveyed to U.S. citizen proxy holders. *See,* Industrial Security Regulations at § 2–205(c).

5. The DIS is vested with the responsibility for implementation of the Industrial Security Program under the Industrial Security Regulations. (Industrial Security Regulations at § 1–101(c)). As such, the DIS is the agency of the DOD that interacts with industry participants with respect to compliance with the Industrial Security Regulations. (Steward Dep.Tr. 21–22).

and the Army's Line-of-Sight Anti–Tank Missile System ("LOSAT") program.

48. In addition to the presentations made by Missiles Division personnel and their responses to questions posed by Thomson representatives, Missiles Division personnel also provided Thomson's representatives with written materials detailing the role of COMSEC and other Proscribed Information in each contract. The information provided included the information which was later repeated in LTV's response to CFIUS regarding the use of COMSEC information in the design and production of LTV's missiles.

49. Thomson advisors who were present at that meeting expressed directly to Mr. Smith that they were satisfied with the cooperation and information that was provided to them by Smith and his colleagues. Indeed, Ms. Madsen related her belief that she had everything she needed and saw no reason why she couldn't sell an arrangement in Washington based on what she had obtained.

50. The information that the Missiles Division personnel provided to Thomson's representatives at the April 24 meeting was directly pertinent to Thomson's proposed argument to the DOD that the impact of COMSEC in the Missiles Division's contracts was manageable, could be isolated and, therefore, should not prevent the DOD from permitting Thomson to operate the Missiles Division under an SSA.

### ii. *LTV Assisted Thomson In Its May 7 Presentation To The DOD*

51. Immediately after this Court approved Thomson's bid for the Missiles Division, all communications by Thomson representatives with the DOD were referred to Chester Paul Beach, Jr., the acting DOD general counsel, while the DOD established procedures for its review of the Thomson transaction.

52. Shortly thereafter, a working group was established within the DOD to consider the Thomson acquisition and to discuss a suitable security mechanism with Thomson. By letter dated April 24, 1992, Nina Stewart, Deputy Assistant Secretary of Defense for Counter-intelligence and Security Countermeasures, the head of the working group,

agreed to Thomson's request for a meeting between representatives of Thomson and her working group "to discuss the security arrangements, *i.e.* voting trust or proxy agreement which will be required by the Department of Defense." The meeting was originally scheduled for May 1, 1992, but was postponed at Thomson's request until May 7, 1992.

53. Ms. Stewart's letter did not request the presence of LTV representatives at the meeting. Nor did Ms. Stewart or Mr. Beach ever inform Thomson or LTV representatives that the presence of LTV representatives at the meeting was either necessary or desirable.

54. Nevertheless, Thomson requested that Missiles Division representatives accompany Thomson to the May 7 DOD meeting to support Thomson's presentation of its SSA proposal. Thomson specifically identified Messrs. Musselman, Hagler and Christopher Griner, outside counsel to LTV, as individuals that it would like to have attend the May 7 DOD meeting.

55. Responding to Thomson's request, Mr. Boyle, the President of LTVAD, initially expressed reluctance to require Missiles Division personnel to attend the May 7 DOD meeting for fear that doing so would antagonize the Missiles Division's primary customer, the Army, because it had become increasingly apparent that the DOD, and particularly the Army, were opposed to Thomson's proposed SSA and were only willing to discuss a proxy agreement or voting trust.

56. Antagonizing the DOD and the Army could have been detrimental to the business interests of the Missiles Division regardless of which entity owned it. Accordingly, it was reasonable for LTV not to take actions that would alienate the DOD.

57. After receiving Mr. Boyle's response, Mr. Bell telephoned Mr. Hoag, to whom Mr. Boyle reported, to enlist Mr. Hoag's assistance in obtaining LTV representation at the May 7 DOD meeting. Mr. Hoag had previously invited Mr. Bell to contact him should Thomson encounter any difficulty in obtaining cooperation from LTV. This was the

first time that Mr. Bell felt it necessary to take advantage of that invitation for assistance. Mr. Hoag assured Mr. Bell that he would attend to the matter and asked Mr. Bell to be certain to call him if Mr. Bell required any assistance in the future.

58. Immediately after speaking to Mr. Bell, Mr. Hoag countermanded Mr. Boyle's letter. Although he was sensitive to Mr. Boyle's concern about not antagonizing the Army, Mr. Hoag instructed Mr. Boyle to provide LTV representation at the meeting and made it clear to Mr. Boyle that he disagreed with Mr. Boyle's initial reluctance to provide such representation. Mr. Hoag followed up this conversation with a note to Mr. Boyle making sure that Boyle "understood once again how important this transaction was to us and what I expected from him in the way of behavior furthering this effort."

59. At around the same time that Mr. Bell contacted Mr. Hoag, Peter Lyons, one of Thomson's counsel, contacted counsel for various LTV creditors' committees. Counsel for such creditors' committees contacted LTV and expressed the view that LTV representatives should accompany Thomson to the May 7 DOD meeting. Counsel for the creditors' committees also invited Lyons to contact them should Thomson believe it was encountering any difficulty in obtaining cooperation from LTV in the future.

60. This was the only instance in which Thomson contacted either Mr. Hoag or counsel for the creditors' committees with respect to any perceived lack of cooperation by LTV, despite the invitations from Mr. Hoag and from the creditors to Thomson's representatives to do so.

61. Consequently, as Thomson requested, LTV agreed that Messrs. Musselman, Hagler and Griner would accompany Thomson representatives to the May 7 meeting. Mr. Musselman was thought to be the best person from LTVAD to attend the May 7 meeting because he was number two in command of that division, he knew the subjects, and knew about all the security and programs.

62. Notwithstanding this incident, Mr. Boyle was supportive of the Thomson transaction. Indeed, in addition to Mr. Boyle's fiduciary duty to LTV, it was in Boyle's financial interest to close the transaction. LTV had agreed to pay Mr. Boyle a bonus of $675,000 upon the closing of the sale of the Missiles and Aircraft Divisions.

63. Senior management of the Missiles Division also preferred Thomson as the purchaser over Martin Marietta and Lockheed. This was due to the fact that Martin Marietta was a competitor of the Missiles Division and that Martin Marietta and Lockheed would continue to operate the Missiles Division in conjunction with the Aircraft Division, while Thomson would operate the Missiles Division as a stand alone company, which Missiles Division management strongly preferred.

64. Prior to the May 7 DOD meeting, Messrs. Musselman, Hagler and Griner met with Thomson's representatives to assist Thomson in preparing for its presentation to the DOD. Messrs. Musselman and Hagler made suggestions for modifications to Thomson's proposed presentation and Musselman conferred with Missiles Division personnel to confirm that the presentation materials, including the graphics prepared by Thomson for the meeting with the DOD, were accurate. Corrections were made to the presentation as a result of the comments of Missiles Division personnel.

65. The May 7 DOD meeting was attended by Messrs. Musselman, Hagler and Griner representing LTV, Messrs. Bell and Culvahouse and Ms. Madsen representing Thomson, and Robert Parker, the recently retired President of the Missiles Division.

66. Thomson made an oral and graphic presentation to the DOD in support of its proposal for an SSA. In its presentation, Thomson sought to persuade the DOD working group that the development and testing functions in the Missiles Division contracts requiring access to COMSEC could be isolated and segregated from the production function under those contracts.

67. The information and materials used by Thomson to prepare its presentation and to demonstrate this point were provided to Thomson by LTV during the April 20–24 Meetings in Grand Prairie between Thomson representatives and Missiles Division pro-

gram managers and program management personnel.

68. At the May 7 DOD meeting, Mr. Musselman supported Thomson's position that functions requiring access to COMSEC in the Missiles Division's contracts could be segregated from the majority of activity under the contracts. Thus, he informed the DOD, for example, of the physical separation of production from development efforts on the MLRS program, the Missiles Division's principal program.

69. Mr. Musselman was not asked by Thomson to make a presentation at the meeting, but attended the meeting prepared to answer questions and brought materials that he could refer to on technical issues. At the meeting, Mr. Musselman did answer various questions posed by members of the DOD working group.

70. Despite the combined efforts of the Thomson and LTV representatives, the DOD continued to prefer a voting trust or proxy agreement.

### iii. *LTV Continued To Assist Thomson With Its DOD Efforts Even After Thomson Withdrew Its SSA Proposal*

71. On or around May 20, 1992, Dr. Fenter traveled to Paris, at Thomson's request, to confer with Alain Gomez, the Chairman and Chief Executive Officer of Thomson, S.A. and Thomson–CSF, concerning Thomson's efforts to arrive at a mutually satisfactory security arrangement with the DOD. Dr. Fenter made suggestions to Mr. Gomez that he thought would be helpful to Thomson's efforts, including a suggestion that Thomson abandon its SSA and offer to enter into a proxy agreement acceptable to the DOD.

72. By letter dated May 21, 1992, Thomson withdrew its application for an SSA. Dr. Fenter's discussions with Thomson with respect to the possibility of accepting a proxy agreement influenced Thomson's decision to withdraw its SSA proposal. Subsequently, Thomson began to formulate a proposal to the DOD for a proxy agreement that would be acceptable to Thomson.

73. Missiles Division personnel, including Dr. Fenter and Gerald Troxel, Chief Financial Officer of the Missiles Division, reviewed Thomson's proxy proposal and conferred with Thomson's advisors on how best to make the proposal palatable to the DOD so that some agreement could be reached that would allow Thomson to acquire the Missiles Division.

74. However, Thomson was unable to reach an agreement with the DOD because Thomson insisted on maintaining management control over the Missiles Division, such as the right to approve budgets and mergers and acquisitions and the right to determine the compensation and retention of the chief executive officer. Donald Atwood, Deputy Secretary of Defense, had previously testified before Congress that Thomson would be permitted to acquire the Missiles Division only if it agreed to the role of a "passive" investor, and that Thomson's proposal was deemed by the DOD to be incompatible with that concept.

75. By letter dated June 16, 1992, Ms. Stewart informed Thomson that after "intensive, detailed and rigorous" review, the DOD had "concluded that a Voting Trust is required to negate foreign ownership control and influence." Ms. Stewart further informed Thomson that the voting trust must be in the form provided by the DOD. Thomson, however, would not agree to enter into a voting trust.

76. After the May 7 meeting, LTV was not asked by Thomson to attend any further meetings with the DOD regarding an SSA, proxy agreement or voting trust.

### C. *LTV's Efforts To Assist Thomson In Obtaining A Favorable CFIUS Determination*

#### i. *LTV's Efforts To Respond To Information Requests From CFIUS*

77. In addition to requiring a mutually satisfactory security arrangement with the DOD, Thomson needed to obtain Presidential approval under the Exon–Florio amendment pursuant to the CFIUS process.

78. Among Mr. Hagler's many responsibilities for the closing of the Thomson transaction, Mr. Hagler was responsible for the "LTV CFIUS operation." Between April 3,

1992 and June 16, 1992, CFIUS sent thirteen rounds of informational requests to the Missiles Division. CFIUS generally requested responses within 48–72 hours.

79. The detailed nature of each round of requests and the short response time allotted by CFIUS required Missiles Division personnel to devote thousands of hours to the project, often laboring through nights and over weekends.

80. For each round of informational requests, Messrs. Hagler, Musselman and Smith conducted a review of the questions to determine which individual within the Missiles Division could best respond to each question or subquestion. Memoranda were circulated to approximately 20 individuals with each round of requests asking for their assistance in formulating appropriate responses.

81. Compiling the material to respond to the informational requests of CFIUS was designated as a priority for each individual involved. Approximately 20 individuals worked on formulating responses to each round of questions. All of the requests from CFIUS to LTV for information were promptly and thoroughly answered.

ii. *LTV's Responses To CFIUS Supported Thomson's Position*

82. One of the primary arguments made by Thomson in support of its SSA proposal was that the COMSEC requirements in the Missiles Division's contracts were primarily for development and testing purposes and that those functions could be isolated and segregated from the production function under Thomson's proposed SSA. Thomson requested that this point also be emphasized in LTV's responses to inquiries from CFIUS.

83. The Missiles Division assembled and presented to CFIUS substantial information and supporting documentation on this point, as well as other points supportive of Thomson's acquisition.

84. For example, in its response to CFIUS dated May 8, 1992, LTV stated:

*The design/production of missiles does not require knowledge of COMSEC technology, equipment, and technical data.* During development of a missile system, the basic use of COMSEC equipment is to provide a secure link to transmit classified flight test data from a missile in flight to a ground receiving station. The COMSEC equipment is used in the missile to encode or encrypt the data and the COMSEC equipment in the ground station is used to decode the data. *The missile designers do not require any knowledge of COMSEC equipment except encoder installation requirements* (size, weight, mounting requirements) and input electrical/electronic requirements (power requirements, instrumentation data stream characteristics/limitations, etc.). This type of information does not include COMSEC sensitive data and therefore does not require transfer of COMSEC technology information to the missile subsystem and system designers. Since production missiles do not require an instrumentation and telemetry system, *COMSEC equipment normally is not required in support of production programs.* The COMSEC equipment is provided by the U.S. Government as Government Furnished Equipment (GFE) to the Missiles Division for those programs which have COMSEC requirements. *Most of the Missiles Division employees assigned to a missile development program have no knowledge of COMSEC technology, equipment, or technical data,* except such knowledge as is required to serve as custodians of the equipment. . . .

(Emphasis added). This response was consistent with and supportive of the presentation that Thomson made at the DOD on May 7, 1992.

85. The DOD is a member agency of CFIUS and played an active role in the CFIUS process. The DOD engaged in a significant amount of interplay with CFIUS in this process. In fact, Steven Canner, the Treasury Department's Director for International Investment and the Chairman of CFIUS at the time it considered the Thomson deal, testified before the Senate Armed Services Committee on April 30, 1992, that "Treasury is working very closely with Defense on this transaction and we view our efforts as collaborative and cooperative."

86. Senior DOD officials, including Deputy Secretary of Defense Atwood and Assis-

tant Secretary of Defense for Command, Control, Communications and Intelligence Duane P. Andrews, had access to the information provided to CFIUS by LTV, including information regarding the use of COMSEC in the Missiles Division contracts. There is nothing in the regulations governing CFIUS that would have prevented DOD officials working on the CFIUS review from sharing the information obtained during that review with Ms. Stewart's working group (*see* 50 U.S.C.App. 2170(c); 31 C.F.R. § 800.101 *et seq.*), and it was reasonable to assume at the time that such information was being so shared.

### iii. *LTV Attendance At CFIUS Meetings*

87. In addition to providing written information to CFIUS, LTV and Thomson representatives were invited to and attended at least four meetings with representatives of the CFIUS member agencies—including representatives of the DOD—during the period from the end of April through the end of June. Mr. Hagler and outside counsel, Joseph Dennin of McKenna and Cuneo, attended on behalf of LTV. Each meeting lasted approximately two to three hours. The purpose of the meetings was to clarify for the CFIUS members the written information provided in response to inquiries from CFIUS.

88. During the course of the CFIUS meetings, LTV representatives responded to all questions directed to them by CFIUS members, and attempted, where possible, to provide information helpful to Thomson's position. For example, at one of the CFIUS meetings, the LTV representatives were asked by CFIUS about LTV's above-quoted response concerning COMSEC. Mr. Hagler responded that LTV's written response was accurate and that Thomson was correct in its position that access to COMSEC was needed to perform the development and testing functions under the Missiles Division contracts and not for the actual production or manufacture of the missiles themselves.

### iv. *LTV Supplied Information To The Army In Connection With A Study It Was Preparing For The DOD's CFIUS Review*

89. In early June 1992, representatives of the Army visited LTV to conduct a study related to the DOD's CFIUS review of the Missiles Division's critical technologies. The study was conducted under a tight schedule. Missiles Division personnel were made available by LTV to facilitate the evaluation and were directed to cooperate fully with the Army representatives. Missiles Division personnel provided the Army representatives with the information that they requested.

### D. *LTV's Efforts To Assist Thomson In The Public Relations And Congressional Lobbying Arenas*

90. After approval of the Thomson bid for the Missiles Division and until Thomson terminated the Asset Purchase Agreement, LTV made its employees available to Thomson and devoted substantial time and effort to assist Thomson in the public relations and Congressional arenas.

91. After this Court approved Thomson's bid, Mr. Scheer participated as an integral member of Thomson's working group and spent close to 100% of his time after approval of Thomson's bid through July 1992 working to facilitate the closing of the transaction.

92. In his capacity as LTV's "point man" in Washington, Mr. Scheer met with Messrs. Gomez, Bell and Bertrand de Fouchier, Vice President for North America of Thomson–CSF, on April 11, 1992, the day after this Court approved the sale of the Missiles Division to Thomson. At that meeting, Mr. Scheer expressed LTV's desire to cooperate fully in order to close the sale of the Missiles Division to Thomson. At that meeting and others, Mr. Scheer made numerous suggestions based on his long years of experience in the public relations field, in order to help Thomson consummate the transaction.

93. For example, Mr. Scheer advised that Thomson's representatives should meet with as many influential members of Congress as soon as possible. Mr. Scheer specifically suggested that he arrange a meeting in South Carolina between Mr. Gomez and Senator Hollings, then Chairman of the Senate Commerce Committee.

94. Furthermore, Mr. Scheer suggested that Thomson mount a public relations campaign to counter the negative publicity that Thomson had already received and the fact that Thomson was otherwise relatively unknown in the United States.

95. Mr. Scheer also recommended the firm of Verner, Liipfert, Bernhard, McPherson & Hand to assist with lobbying, when he learned that Mr. Bell was interested in retaining a lobbying firm. Mr. Scheer accompanied Mr. Bell to an interview of Verner, Liipfert for that purpose, but Thomson did not retain that firm.

96. Mr. Scheer also stated that representatives of LTV would contact members of Congress who had not already expressed opposition to a Thomson acquisition of the Missiles Division. In LTV's business judgment, it would not further either LTV's or Thomson's interests to lobby members of Congress who had publicly announced their opposition to a Thomson acquisition of the Missiles Division because to do so would only antagonize them, and their continuing support for the Missiles Division's programs would be important to the Missiles Division's future business prospects. Nonetheless, at Thomson's request, LTV did contact members of Congress who publicly opposed the transaction in those instances in which LTV had a good relationship with a particular Congressperson and believed that it could avoid antagonizing him or her.

### i. *LTV's Participation In Strategy Meetings*

97. Prior to and after this Court approved its bid for the Missiles Division, Thomson assembled a team of politically influential lawyers, public relations firms, lobbyists and other advisors to assist it in acquiring the Missiles Division. Many members of this team had prior high level government experience and contacts.

98. For example, Thomson retained the services of:

a. O'Melveny & Myers, a prominent national law firm, and specifically Arthur B. Culvahouse, formerly counsel to the President in the Reagan administration, and William T. Coleman, Jr., formerly Secretary of Transportation in the Ford administration;

b. Powell Tate, a public relations firm headed by Jody Powell, formerly press secretary to President Carter, who was in charge of the Thomson effort, and Sheila Tate, formerly press secretary to Nancy Reagan;

c. Gold & Liebengood, a leading Washington, D.C. lobbying firm, and specifically John Scruggs, who was formerly on the senior staff of Robert Michel, the Republican leader in the House of Representatives;

d. Akin, Gump, Strauss, Hauer & Feld, a well-connected lobbying and law firm, and specifically Joel Jankowsky, a former Legislative Assistant to the Speaker of the House of Representatives; and

e. Kekst & Company, a leading public relations firm.

99. Similarly, Carlyle retained many well-respected advisors to assist it in connection with the transaction with LTV, including:

a. Black, Manafort, Stone & Kelly, public relations consultants, of which Charles Black, a prominent figure in Republican political circles with close ties to the Bush administration, was a principal;

b. International Planning & Analysis Center ("IPAC"), a defense consulting firm partly owned and chaired by Mr. Carlucci, and whose Chief Operating Officer, Grant Green, was a former DOD official;

c. Griffin/Johnson and Associates, a lobbying firm run by Pat Griffin, a former senior assistant to Senator Byrd; and

d. Paul Stevens of Dickstein, Shapiro & Morin, who previously held positions on the National Security Council staff and in the DOD during the Reagan and Bush administrations.

100. After Thomson retained Akin, Gump, Strauss, Hauer & Feld to assist it with its lobbying efforts, Akin Gump arranged for periodic strategy meetings. All strategic aspects of the transactions were discussed at the strategy meetings, including public relations, advertising, Congressional activity, actions Martin Marietta and Lockheed were taking, the CFIUS review, and Thomson's efforts to arrive at a mutually

satisfactory security arrangement with the DOD.

101. Approximately 30 people typically attended these meetings, including representatives of LTV who actively participated. Other attendees included representatives of Thomson and Carlyle, their team of advisors, and a representative of LTV's creditors; John Morehouse of Patton, Blow & Boggs, Washington counsel for the LTV Steel Creditors' Committee.

### ii. LTV's Participation In Public Relations And Advertising Activity

102. In addition to these periodic strategy meetings, Mr. Scheer interfaced frequently with representatives of Thomson and Carlyle and their respective advisors in an attempt to facilitate the closing of the sales of the Missiles and Aircraft Divisions.

103. For example, Mr. Scheer met several times with representatives of Powell Tate to discuss public relations and advertising.

104. At LTV's expense, Mr. Scheer, with the assistance and approval of Powell Tate, supervised the development of a recommended advertising campaign for Thomson.

105. Thomson rejected the advertising proposal.

106. In addition, Mr. Scheer had frequent contact with the press during this period. In his dealings with the press after Court approval of the Thomson bid, Mr. Scheer always expressed LTV's support for the Thomson transaction.

### iii. LTV's Lobbying Activities

107. LTV made substantial efforts to assist Thomson in seeking support from members of Congress and from state government officials in states where the Missiles Division had facilities and employees.

108. For example, Mr. Scheer travelled to Arkansas to meet with David Harrington, Director of Economic Development of that state, to reassure him about the future under Thomson ownership of the Missiles Division's facility and its employees in Camden, Arkansas.

109. Mr. Scheer also spoke personally with Representative Martin Frost and Senators John Glenn and Ernest Hollings, among others, to express support for the Thomson transaction.

110. In addition, Mr. Scheer reviewed and made suggestions with respect to Mr. Bell's proposed testimony before Congressional committees. Some of Mr. Scheer's suggestions were adopted.

111. Moreover, LTV assisted Thomson in formulating strategy for Congressional contacts, and LTV's representatives contacted numerous members of Congress, their staffs and staff members of Congressional committees in support of the Thomson transaction. At Thomson's request, LTV contacted numerous members of the Texas delegation, including some members who had publicly proclaimed opposition to Thomson's acquisition, as well as various members of the House and Senate Armed Services Committees and other influential Committees.

112. These contacts were made primarily, but not exclusively, by Jack Stempler, Vice President for Government Relations of LTVAD, and Wayne Tingle and Frank McKeown, members of Stempler's staff.

113. Mr. Scheer and Mr. Stempler and his staff made clear to the individuals whom they contacted that LTV supported the Thomson transaction; that a sale of LTVAD was critical to LTV's ability to emerge from bankruptcy as a viable enterprise; that LTV wanted Congress to allow the Exon–Florio process to work; and that LTV believed that Thomson could successfully operate the Missiles Division under a security arrangement approved by the DOD.

114. In addition to Messrs. Scheer's and Stempler's efforts, at Thomson's request, Mr. Hoag telephoned Congressman John Murtha. Congressman Murtha was the long-time chairman of the Congressional steel caucus and was well acquainted with Mr. Hoag, who had been a leading steel executive for many years. During this phone call, Mr. Hoag expressed the attractiveness of the Thomson transaction, LTV's support for it and its importance to LTV's plans to emerge from bankruptcy. Mr. Hoag also argued that despite Congressional concerns with respect to the national security issues raised by the

LTV/Thomson transaction, Congress should let the Exon–Florio process work without interference.

115. Thomson also identified Oklahoma Congressman Dave McCurdy, Chairman of the House Committee on Armed Services' Panel on the Structure of the U.S. Defense Industrial Base, and Oklahoma Senator David Boren, Chairman of the Senate Intelligence Committee, as members whom it wanted LTV to contact. Although Messrs. Boren and McCurdy had expressed opposition to the transaction, Mr. Scheer asked Ed Joullian, a member of LTV's Board from Oklahoma, to meet with both. Mr. Joullian contacted them and spoke to them in favor of the transaction.

116. Mr. Scheer and counsel for LTV's creditors also devised a plan to encourage the creditors to use whatever leverage they had in their home states to support the deal. Mr. Scheer met with LTV's creditors and told them that they had an important stake in supporting Thomson, that there was tremendous Congressional opposition to Thomson, and that they should contact members of Congress whom they knew to express their support for the Thomson transaction.

117. In addition to LTV's numerous contacts with members of Congress, representatives of Thomson and Carlyle, including their various lobbyists, made numerous contacts with members of Congress in support of their respective bids for the Missiles and Aircraft Divisions.

118. For example, Mr. Carlucci, who had served, among other things, as Deputy Director of Central Intelligence and Secretary of Defense, testified before Congressional committees and met separately with individual members of Congress in support of the transaction.

119. Despite the combined efforts of LTV, Thomson and Carlyle, no member of Congress ever publicly expressed support for Thomson's proposed acquisition of the Missiles Division.

#### iv. *Thomson's Complaints About Things It Thought LTV Should Have Done*

120. As the situation for Thomson deteriorated in Washington, it began to complain about various things that it thought LTV could or should have done differently to assist Thomson. Virtually all of these things would have been useless gestures that LTV reasonably determined would have been counterproductive or would have been deleterious to LTV's business no matter who its owner was.

121. For example, Mr. Bell asked Mr. Scheer to ask Hoag to testify before a Congressional committee that Thomson's acquisition of the Missiles Division would not adversely affect national security. Neither Mr. Hoag nor LTV was ever asked by any member of Congress to testify before any Congressional committee. However, there is no indication that Mr. Hoag would not have appeared if he had been invited by a member of Congress to testify.

122. Mr. Hoag had no particular expertise in the area of national security and it was LTV's view that it was not credible for LTV to opine on what was best for the United States from a national security standpoint. Indeed, Mr. Carlucci, who did in fact testify before Congress that he saw no national security problems with the Thomson transaction, was seriously criticized by "some of his former friends on the Hill" over this issue. Mr. Scheer determined that exposing LTV's chief executive officer to that kind of abuse made absolutely no sense, and could not help Thomson close in any event. Nonetheless, Mr. Scheer told Mr. Bell he should feel free to call Mr. Hoag directly to request that Hoag testify. Mr. Bell never called Mr. Hoag to ask him to testify.

123. Mr. Bell also asked if Mr. Hoag would attend a meeting in June with Mr. Gomez at Secretary Atwood's office. Mr. Scheer told Mr. Bell that LTV did not want to appear unless Thomson told LTV what it planned to say in advance. Nonetheless, Thomson was told that Mr. Hoag would attend the meeting if Thomson so requested. Mr. Bell, however, never asked Mr. Hoag to attend. Mr. Carlucci, like Mr. Scheer, wanted to see a copy of Thomson's proposal to Secretary Atwood before agreeing to attend the Atwood/Gomez meeting. Mr. Carlucci did not attend the meeting, because among

other things, he did not want to appear to be representing Thomson.

#### E. *LTV's Efforts To Assist Thomson In Structuring An Alternative Sale That Could Satisfy CFIUS And The DOD*

124. On July 6, 1992, Thomson withdrew its application to CFIUS because it anticipated that CFIUS would make a negative recommendation to the President.

125. In the weeks leading up to and following Thomson's withdrawal of its application to CFIUS, Thomson investigated various alternative equity partners and transaction structures that might pass muster with the DOD and CFIUS. To facilitate this process, Missiles Division management arranged expedited due diligence for Thomson's proposed equity partners, including Loral Corporation ("Loral").

126. At a July 8, 1992 hearing, with respect to an objection to the Thomson transaction by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), the union representing the majority of LTVAD's workers, this Court suggested that Thomson's withdrawal from the CFIUS process had ended the transaction as proposed and rendered the issue before the Court moot.

127. Because alternative transaction structures were reportedly being considered by Thomson at that date, LTV supported the continued viability of the Thomson acquisition, albeit in somewhat altered form, and counsel for Thomson assured the Court that a transaction comporting with the requirements of the Asset Purchase Agreement could still close by July 31, 1992 as planned. Thomson's counsel stated: "The voluntary withdrawal of our CFIUS notice was for the specific purpose of restructuring the transaction in such a way as to satisfy both CFIUS and the other governmental agencies." (*See*, Transcript of Hearing of July 8, 1992 at 16).

128. Counsel for Thomson repeated these assurances at the July 21, 1992 hearing on the UAW's objection, at which LTV again supported the viability of the Thomson and Carlyle transactions.

129. In late July 1992, LTV was informed that Thomson had reached an agreement with Loral whereby Loral would acquire a majority interest in the Missiles Division and Thomson would retain less than ten percent of the ownership interest, thus assuming the role of a passive investor and hopefully obviating DOD and CFIUS concerns with respect to foreign ownership security issues. LTV made every effort to encourage Loral and expressed its willingness to consummate a restructured deal with Loral and Thomson.

130. This effort was terminated by Thomson when it decided that, even if such an arrangement would satisfy the DOD and CFIUS, Thomson would not accept an arrangement whereby it would acquire only a passive minority interest in the Missiles Division.

### III. *THOMSON'S FAILURE TO OBTAIN DOD AND CFIUS APPROVALS FOR ITS PURCHASE OF THE MISSILES DIVISION HAD NOTHING TO DO WITH ANY ACTION OR INACTION ON THE PART OF LTV*

#### A. *The DOD's Decision Not To Approve An SSA Was Not Caused By Any Action Or Inaction By LTV*

##### i. *Thomson's Representations To LTV That It Already Had An "Agreement In Principle" With The DOD For An SSA*

131. In support of its bid, on April 1, Thomson provided to LTV a draft agreement for the purchase of the Missiles Division. The draft agreement provided that the closing of the sale was conditioned upon Thomson's agreement with the DOD on an SSA satisfactory to Thomson and either the receipt of a letter from CFIUS stating that it had determined not to investigate the transaction, or the expiration of the Exon–Florio review period without the President having announced a decision to take action with respect to the transaction. However, Section 4.09 of the draft asset purchase agreement represented that Thomson had "reached an agreement in principle with the Defense Investigative Service ('DIS') concerning the terms and conditions of" an SSA for con-

tracts with a security classification of "Secret or below"[6] and further that "[n]o representative of the Defense Investigative Service . . . expressed disagreement with this characterization."

132. Even prior to submitting its April 1 bid, Thomson had repeatedly represented to LTV that Thomson and the DIS had reached an agreement in principle on an SSA applicable to Missiles Division contracts classified at the level of "Secret or below."

133. However, no agreement in principle had been reached between the DIS and Thomson. In fact, DIS had no authority to reach an agreement on an SSA with Thomson. Instead, all decisions on an SSA for Thomson were to be made by the DOD through Ms. Stewart and Mr. Andrews.

ii. *As Of April 1, 1992, Thomson Was Already Aware Of Concern Within The Army Over Thomson's SSA Proposal*

134. Thomson learned as early as October 1991 that representatives of the U.S. Army, including Robert Stohlman, Army Deputy for Acquisition Support, and George Dausman, Army Deputy Secretary for Acquisition, had doubts as to whether an SSA would be a suitable mechanism to protect the national security interests of the United States in the event of a Thomson acquisition of the Missiles Division. At this time, Mr. Bell was aware of the need to "neutralize" the influence of Messrs. Stohlman and Dausman in this process.

135. As early as March 8, 1992, Thomson understood that the DOD might impose a voting trust.

136. Prior to April 1992, Mr. Powers told Thomson that, based on his meetings with government officials, including Stephen Conver, the Assistant Secretary of the Army for Research, Development & Acquisition, Mr. Powers believed that Thomson might not obtain approval for sale of the Missiles Division to Thomson.

137. In March 1992, Gary L. Denman, Director of the Defense Advanced Research Projects Agency ("DARPA") of the Army

sent a memorandum (the "DARPA Memo") to Assistant Secretary Conver in which he stated, among other things, that foreign ownership and control of the Missiles Division would have "serious repercussions" and would necessitate the immediate termination of LTV's participation in the development of the DARPA-sponsored Advanced Land Combat Systems ("ALCOS") technology effort, "jeopardiz[ing] the United States' significant lead in development of the technology. . . ."

138. Thomson was aware of the contents of the DARPA Memo prior to April 1, 1992 and had resigned itself to losing the ALCOS program should it be successful in acquiring the Missiles Division. Additionally, from the negative comments received at Thomson's meetings with representatives of other DOD agencies, Thomson knew that it might lose other contracts if it were the successful bidder.

139. By letter to LTV dated March 26, 1992, which was provided to Thomson prior to April 1, 1992, Assistant Secretary Conver stated that "certain special access contracts . . . cannot be novated to foreign entities, notwithstanding the granting of an industrial security agreement, unless each contract has received a favorable national interest determination." Mr. Conver wrote the letter to LTV in response to a request from LTV for guidance to insure that LTV's actions in connection with a bid by a foreign company for the Missiles Division would not adversely affect national security interests. Mr. Conver further stated that "[o]ther programs would not be continued once the current contracts are completed." When read in conjunction with the DARPA Memo, Conver's letter signalled a concern as to Thomson's ability to obtain approval from the Army—the service with the greatest number of programs with the Missiles Division—and ultimately the DOD, to perform the Missiles Division's contracts.

140. Thomson representatives were well aware of Secretary Conver's opposition to a sale of the Missiles Division to Thomson.

6. Contracts classified at a level of "Secret or below" could also require access to Proscribed Information.

Thomson also knew that Mr. Conver, or persons reporting to him, would have ultimate responsibility to consider recommendations of Army program managers with respect to the granting of National Interest Determinations in connection with Thomson's proposed SSA.

141. In sum, Thomson clearly knew prior to April 1, 1992 that there was hostility in the Army to Thomson's potential acquisition of the Missiles Division.

### iii. *The DOD Expressed Serious Concern With Respect To Thomson's Proposed SSA Prior To The Court's Approval Of Thomson's Bid On April 10, 1992*

142. On the morning of April 1, 1992, prior to commencement of the April 1 hearing, Mr. Stohlman of the United States Army, John Frields of the DOD and Assistant United States Attorney Edward Smith, informed Thomson that they intended to make clear to this Court that, contrary to assertions made by Thomson in its draft asset purchase agreement, (i) the DIS did not have the authority to agree to an SSA for Thomson without the approval of the DOD, (ii) the DOD had not agreed to grant an SSA to Thomson, and (iii) if an SSA were to be approved, it would have to encompass all of the Missiles Division's programs and not just those classified at the "Secret" level or below, thus necessitating receipt of NIDs from all military services that had procurement contracts with the Missiles Division that required access to Proscribed Information.

143. On April 1, 1992, Thomson was also advised by Messrs. Stohlman, Frields and Smith that approximately 75% to 80% of the Missiles Division's contracts required access to COMSEC or other Proscribed Information and that they were prepared to testify in this Court to that effect. Mr. Stohlman, representing the Army, indicated that this fact would make it difficult for Thomson to obtain an SSA.

144. This 75–80% figure was first raised by the DOD based on information from its own sources and was only later confirmed by LTV based on LTV's own internal review of the Missiles Division contracts.

145. Having received the Conver letter and having spoken to Mr. Stohlman on April 1, Thomson had knowledge as of April 1, 1992 of Stohlman's and Conver's position with regard to Thomson's potential acquisition of the Missiles Division.

146. According to Ms. Madsen, Thomson's primary counsel for security matters, Mr. Frields was the DOD employee who had most strongly supported Thomson's SSA proposal when Thomson had its discussions with various DIS officials in late 1991 and early 1992. In fact, Ms. Madsen had relied on Mr. Frields when the other DIS officials with whom she was dealing had raised serious problems about the effectiveness of Thomson's proposed SSA. On April 1, 1992, Mr. Frields told Ms. Madsen that whatever she thought he had told her before, the fact was that because of the level of classified information requirements contained in the Missiles Division contracts, the DIS did not have the authority to approve an SSA for Thomson.

147. On April 2, 1992, Mr. Culvahouse wrote to Assistant Secretary of Defense Andrews, Assistant Attorney General Stuart M. Gerson, and General Counsel of the Army William J. Haynes expressing concern that government representatives were prepared to testify that the DIS had no authority to negotiate an SSA without DOD approval, no agreement in principle had been reached between Thomson and DIS and that an SSA could not go into effect without NIDs being obtained for all contracts requiring access to Proscribed Information.

148. By letter dated April 6, 1992, Mr. Andrews responded that he had made "a preliminary determination" that an SSA for the Missiles Division would not permit Thomson to perform contracts requiring access to Proscribed Information regardless of whether such contracts were classified at the level of Secret or below. For the performance of such contracts, Mr. Andrews added, "Thomson would have to enter into a proxy agreement or voting trust agreement."

149. By letter dated April 7, 1992, Assistant Attorney General Gerson, head of the Justice Department's Civil Division, responded to Culvahouse's April 2 letter and stated

that the position expressed by Assistant United States Attorney Smith to Thomson on April 1, 1992 with respect to Thomson's ability to operate the Missiles Division under an SSA was consistent with the DOD's position set forth in the April 6 Andrews letter.

150. Unhappy with Mr. Gerson's response and with his interpretation of the Andrews letter, Mr. Culvahouse contacted the DOD's Acting General Counsel, Mr. Beach, and asked him to convey the correct interpretation of Andrews letter to the Justice Department. Mr. Beach responded to Mr. Culvahouse that Mr. Gerson had accurately characterized the DOD's position that if the Missiles Division had contracts which required access to Proscribed Information, then an SSA would not be granted even for contracts at the level of Secret or below.

151. After Mr. Beach spoke with Mr. Culvahouse, Messrs. Beach and Andrews decided to write to Mr. Culvahouse to convey the fact that Mr. Gerson's interpretation of Mr. Andrews letter was correct and to make clear to Mr. Culvahouse the meaning of Andrews letter. Mr. Beach wanted to make clear to Mr. Culvahouse that if LTVAD, as the acquired entity, was going to continue to have responsibility on the contracts that invoke this proscribed information, an SSA was not going to be sufficient.

152. Accordingly, on April 8, 1992, in a letter faxed early in the day to Thomson and to LTV, Mr. Beach told Mr. Culvahouse:

If, at the time LTV were acquired by Thomson, there remained in place contracts requiring access to types and categories of information which Assistant Secretary Andrews has determined may not be covered by a SSA, a SSA would not be placed into effect for any purposes, including contracts that may be at the SECRET level or below.

Mr. Beach further stated that "we understand that a number of LTV's contracts may require access to such [proscribed] information." This language was used because Mr. Beach had received reports from DOD staffers that significantly more than 5–7% of the Missiles Division contracts required access to Proscribed Information.

153. Unhappy with the Gerson and Beach letters, Mr. Culvahouse next contacted Deputy Assistant Attorney General Stuart Schiffer in search of an opinion that would favor Thomson's position. Mr. Schiffer told Mr. Culvahouse that he agreed with Messrs. Smith and Beach.

154. By April 8, 1992, the DOD was engaged in a contract by contract review to determine what kinds of contracts LTV was then currently performing for the department and the proscribed information contained in those contracts.

155. On April 8, 1992, Assistant United States Attorney Edward Smith stated to this Court that only the April 6 Andrews letter and the April 8 Beach letter could be viewed as accurately representing the DOD's position as to whether or not Thomson would be able to obtain approval to operate the Missiles Division under an SSA. Mr. Smith's stated purpose was to ensure that the Court was not misled by allegations by "private parties," including Thomson's officers and representatives, with respect to the government's position on granting approvals to Thomson for operation of the Missiles Division.

156. Thus, as of April 8, 1992, representatives of the Army had informed Thomson that it did not have an agreement in principle on an SSA and that they believed that 75–80% of the Missiles Division's revenues derived from contracts that required access to COMSEC or other Proscribed Information. Additionally, Thomson had been informed of the DOD's position that, among other things, an SSA would not be sufficient to enable Thomson to perform Missiles Division contracts requiring access to Proscribed Information, and that if any such contracts remained in place, an SSA would not be placed into effect for any purpose.

157. Carlyle also believed that as of April 8, 1992 an SSA was not going to be enough for the DOD.

158. In his testimony before this Court at the April 8 hearing, James Powers—LTV's Chief Financial Officer who was in charge of the effort to negotiate the sale of LTVAD's assets—identified the primary factors that

led LTV to believe that there was a substantial risk that Thomson could not close on a sale of the Missiles Division. Among the sources of concern enumerated by Mr. Powers were: (i) letters written by influential members of Congress to the President and the DOD expressing opposition to Thomson's acquisition of the Missiles Division, (ii) the March 26 letter from Conver cautioning LTV that certain Missiles Division contracts could not be novated to a foreign company without NIDs, and (iii) the April 6 and 8 letters from Andrews and Beach.

159. Mr. Powers testified that the letters from Andrews and Beach heightened his concern that Thomson might be unable to close on a sale of the Missiles Division. Referring to the April 6 Andrews letter, Mr. Powers testified that he was particularly concerned by Andrews' statement that a proxy agreement or voting trust, rather than an SSA, would be required for Thomson to perform Missiles Division contracts requiring access to Proscribed Information.

160. Mr. Powers explained that an internal review had been conducted of the Missiles Division programs. This internal review, conducted by LTV after the Army gave its estimate to Thomson that 75% to 80% of the Missiles Division's revenues were attributable to contracts which required access to COMSEC or other Proscribed Information, confirmed what the Army had already independently concluded. Thus, Mr. Powers testified, that if the DOD determined that any contract requiring access to COMSEC would require a voting trust, there appeared to be a serious risk that Thomson might not be able to obtain an SSA to operate the Missiles Division—which was a condition to Thomson's obligation to proceed with a purchase of the Missiles Division under the asset purchase agreement proposed by Thomson. The April 8 letter from Mr. Beach, Mr. Powers testified, increased that concern.

161. Additionally, Mr. Powers testified as to LTV's concern that Thomson might not be able to obtain a favorable recommendation from CFIUS. In this regard, Mr. Powers cited letters from members of Congress to the President urging the President to use his Exon–Florio power to block Thomson's purchase of the Missiles Division should such a transaction be approved by the Bankruptcy Court.

162. At the April 8 hearing, Thomson's counsel expressed full confidence that Thomson would be successful in achieving agreement on an SSA with DOD. On the court record, Thomson's counsel stated that "Thomson is experienced not just in France, but has ... significant government [contracts] in this country. It knows what it is about with respect to dealing with the United States government and with the Department of Defense." (Transcript of Hearing, April 8, 1992 at p. 381).

163. Despite Mr. Powers' testimony and the Andrews and Beach letters, as well as Mr. Culvahouse's unsuccessful efforts to have Andrews letter reinterpreted to favor Thomson, Mr. de Fouchier, a Thomson officer, reiterated in testimony at the April 8 hearing that Thomson was "absolutely convinced [it would] get an SSA at the secret level." (Transcript of Hearing, April 8, 1992 at p. 317).

164. In short, notwithstanding Thomson's earlier conversations with lower-level DOD and DIS officials, as of April 10, 1992, when this Court approved the Thomson transaction and Thomson agreed to the $20 million reverse break-up fee, Thomson knew that the DOD had serious reservations about its willingness to allow Thomson to acquire the Missiles Division, particularly if Thomson maintained its position that it required an SSA in order to operate the Missiles Division.

iv. *The DOD Determined That A Voting Trust Or Proxy Agreement Would Be Required In Order For Thomson To Operate The Missiles Division*

165. Representatives of the DOD, who would be involved in approving any security arrangement with Thomson, determined that a voting trust or proxy agreement, rather than an SSA, would be required in order for Thomson to operate the Missiles Division.

166. This decision was the product of the collective judgment of those representatives of the DOD responsible for safeguarding the national security interests of the United

States in this instance. LTV was not asked to participate in, and could not have influenced, the decision-making process.

167. The individuals in the DOD most involved in the foreign ownership and control issues with respect to Thomson's bid for the Missiles Division were Messrs. Andrews and Beach and Ms. Stewart. Assistant Secretary Andrews reported directly to Deputy Secretary Atwood.

168. Shortly after bankruptcy court approval of the Thomson bid for the Missiles Division, Mr. Culvahouse was informed by Assistant Secretary Andrews that Mr. Beach would be the sole point of contact for parties interested in Thomson's proposed acquisition of the Missiles Division until appropriate procedures for the DOD's review of the matter were established by Beach. Accordingly, the DOD program managers were not to be contacted and all attempted communications with representatives of the DOD concerning the Thomson transaction would be referred by them to Mr. Beach.

169. Mr. Beach's instruction was limiting for Thomson because Thomson wanted to lobby the DOD program managers in support of the transaction and were precluded by the DOD from doing so.

170. The DOD established a working group, consisting of representatives from each affected contracting office or agency within the DOD, to consider the appropriate security mechanism under which Thomson could operate the Missiles Division. Ms. Stewart was appointed as head of the group.

171. The working group compiled detailed descriptions of the DOD programs and contracts involving LTV and assessed the sensitivity of those programs to the DOD's mission. In addition, it performed a contract by contract review to determine what percentage of revenues the Missiles Division derived from contracts requiring access to Proscribed Information.

172. The DOD considered the issue of the appropriate security mechanism under which Thomson would be permitted to operate the Missiles Division to be a matter for determination solely by the DOD. Accordingly, representatives of the DOD did not solicit LTV's views in reaching their conclusions. Nor would it have been appropriate, from the DOD's standpoint, for representatives of LTV to lobby representatives of the DOD in support of any particular security mechanism.

173. Deputy Secretary Atwood determined that Ms. Stewart would be the sole point of contact for all private parties on industrial security issues and Cheryl Opacinch of the Defense Technology Security Administration would be the DOD's sole point of contact for all private parties on CFIUS issues. Mr. Beach so informed DOD personnel as well as Thomson, Carlyle and all other interested parties. Thomson knew that as of April 17, 1992, Ms. Stewart was the point of contact on industrial security issues.

174. Mr. Beach's directive was designed to ensure that all interested parties had equal access to the decision makers in the DOD and also to prevent the DOD from being consumed by consideration of the transaction and distracted from its other responsibilities. Mr. Beach feared that such distractions would occur if Thomson were permitted to contact lower level officials in the DOD and services, such as the program managers.

175. Mr. Beach told Mr. Culvahouse that, on the industrial security issues, Thomson had to deal solely with Ms. Stewart's group and that Thomson would not be permitted to contact the program managers at the individual program level.

176. Mr. Beach's directive applied to all interested private parties, including LTV. Accordingly, LTV could not contact program managers or any other individuals in the DOD, other than Ms. Stewart, to discuss industrial security issues related to the Thomson acquisition.

177. By letter dated April 17, 1992, Mr. Beach informed Thomson's counsel of the existence of the working group and of the DOD's willingness to begin discussions immediately with Thomson regarding the voting trust arrangement or a proxy agreement.

178. In his letter, Mr. Beach reiterated the DOD's determination that a voting trust or proxy agreement, rather than an SSA,

would be necessary to protect U.S. national security interests.

179. In addition, Mr. Beach informed Mr. Culvahouse that the DOD believed that the percentage of the Missiles Division's contracts that required access to such information was "substantially larger" than the 5 percent figure that Thomson had been claiming.

180. Moreover, Mr. Beach informed Mr. Culvahouse of the DOD's position "that all the ongoing contract work being performed by LTV units must be completed by a successor in interest satisfactory to the Department. The successor in interest must have the facility security clearance appropriate for all existing contracts." In other words, the DOD would not approve a security mechanism that permitted Thomson to perform only a portion of LTV's contracts. Rather, the DOD would only approve a single security mechanism that was sufficient for Thomson to obtain a facility security clearance to perform all the Missiles Division's contracts.

181. By April 17, although its review was not complete, the working group had determined that a majority of the Missiles Division's revenues were derived from contracts that required access to Proscribed Information. Furthermore, the DOD had determined that an SSA would not be approved as long as any of the Missiles Division's contracts required access to Proscribed Information, including COMSEC.

182. Thomson recognized that the Beach letters of April 8 and 17 evidenced a greatly increased risk that it would not be able to obtain an SSA to operate the Missiles Division for any purpose. Jean Paul Perrier, Thomson's Senior Vice President in charge of its Missile System Group and the executive responsible for overseeing Thomson's acquisition of the Missiles Division, testified that Beach's April 17 letter made clear to him that under Thomson ownership the LTV Missiles Division would be precluded from performing any contract which required access to Proscribed Information.

183. Moreover, on April 20, 1992, before this Court entered the Sale Order and prior to execution of the Asset Purchase Agreement, Ms. Madsen, counsel to Thomson on DOD security issues, notified Thomson's General Counsel, Olivier Lambert, by memorandum, that she had received information from LTV officials and Robert Parker that the Missiles Division was "authorized to possess COMSEC information for contracts involving 76.6% of [the Missiles Division's] revenues." Ms. Madsen further stated that this information was compiled from the Form DD-254's attached to the Missiles Division contracts, "which are normally reviewed in due diligence." She and John Holum of Mr. Culvahouse's office agreed that such forms should have been reviewed by Thomson during due diligence in 1991. This information confirmed what Mr. Stohlman had said on April 1 and Mr. Powers had testified on April 8.

184. Ms. Madsen further told Mr. Lambert that:

> [a]s you can tell from the Beach letter of April 17, the DOD perspective is that the COMSEC problem is severe and, apparently, may only be resolved by a voting trust or proxy agreement for all programs containing this component.

As a result, Ms. Madsen cautioned, Thomson "may want to consider this increased risk before proceeding with" execution of the Asset Purchase Agreement on April 22, 1992. Mr. Culvahouse agreed with Ms. Madsen's assessment and expressed that agreement to Thomson representatives.

185. Nonetheless, Thomson entered into the Asset Purchase Agreement without any change, either in Thomson's agreement to pay the reverse break-up fee if an SSA was not achieved, or in Thomson's representation in Section 4.09 that it had reached an agreement in principle with the DIS on an SSA and that no DIS official had expressed disagreement.

186. At the time Thomson made this representation on April 22, all of its primary advisors and representatives realized that Thomson's prior negotiations with the DIS were, at that point, meaningless and that the DOD had made clear to Thomson that an SSA would almost certainly not be granted given the large proportion of Missiles Divi-

sion contracts that required access to COM-SEC or other Proscribed Information.

187. After April 17, Thomson contacted Ms. Stewart to arrange a meeting with the working group. Ms. Stewart responded by letter dated April 24, 1992 to Mr. Culvahouse, scheduling a meeting with Thomson on May 1, 1992 "to discuss the security arrangements, *i.e.,* voting trust or proxy agreement which will be required by the Department of Defense (DoD) in order for the acquired unit to continue to perform on classified contracts which contain proscribed information."

188. Ms. Stewart's letter intentionally excluded an SSA among the security arrangements that would be discussed at the meeting because the DOD indicated that the only way to facilitate the asset purchase was through a voting trust or proxy agreement.

189. Attached to Ms. Stewart's letter was a list of the individuals from the DOD and the Army who would comprise the working group and who would attend the meeting. This list consisted almost entirely of lawyers and procurement officers.

190. Mr. Bell testified before a Senate Committee on April 30, 1992 that he had asked for a one-week postponement of the meeting that had been called by Nina Stewart because he thought the meeting could be a "stacked-deck meeting" based on the fact that the list of DOD participants at the meeting did not include program executives—who Thomson believed were familiar with the programs for which the Missiles Division had contracts—but rather procurement officers (*e.g.,* Messrs. Stohlman and Dausman) who could be hostile to the Thomson effort. Mr. Culvahouse was also concerned about the make-up of the DOD working group.

191. Accordingly, at Thomson's request, the meeting was postponed to May 7, 1992.

v. *Senior DOD Officials Testified Before Congress That Thomson's Acquisition Would Have To Be In The Form Of A Passive Investment*

192. On April 28, 1992, Deputy Secretary of Defense Atwood testified before the House Armed Services Committee.

193. In response to questions concerning Thomson's bid for the Missiles Division, Mr. Atwood testified that Thomson's involvement in the Missiles Division would have to take the form of a "passive ownership"—for example, the right to attend the stockholders meetings, but not to be involved in the daily operation of the company—or it would not be approved. Mr. Atwood made clear that his insistence that Thomson be restricted to the role of a passive stockholder was not only to prevent the release of classified information but also because of his concerns over Thomson's ability to outspend and, therefore, undermine non-government supported U.S. defense industry companies. Both Mr. Beach and Ms. Stewart understood that passive ownership was consistent with a voting trust or proxy agreement, but not with an SSA.

194. On April 30, 1992, Mr. Beach testified before the Senate Subcommittee on Defense Industry and Technology of the Senate Armed Services Committee. In addition, Mr. Bell testified on behalf of Thomson and Mr. Carlucci testified on behalf of Carlyle.

195. Mr. Beach testified that:

The Department has notified Thomson through its attorney in correspondence which was provided to the court and creditors in the bankruptcy proceeding, of its assessment that a proxy agreement or voting trust, rather than an SSA, will be necessary in order for Thomson to be permitted to perform LTV missiles division contracts requiring access to the categories of proscribed information.

196. After Mr. Beach testified, Mr. Carlucci testified that he had spoken with Mr. Atwood, who informed him that the DOD had not made any final decision with respect to the appropriate security mechanism for a Thomson acquisition of the Missiles Division. The subcommittee left the record open for a clarification of the DOD's position in light of Mr. Carlucci's statement.

197. Mr. Beach met with Deputy Secretary Atwood and Assistant Secretary Andrews to discuss what had transpired at the subcommittee hearings. On the basis of those discussions, Mr. Beach sent a letter dated June 3, 1992 to the subcommittee confirming that the DOD's determination that a

proxy agreement or voting trust would be required had been "accurately described and characterized in [Mr. Beach's April 30] testimony."

### vi. The DOD Considered And Rejected Thomson's SSA Proposal

198. At the outset of the May 7 DOD meeting, Ms. Stewart asked if Thomson was prepared to consider either a voting trust or a proxy agreement. Thomson insisted on pressing its SSA proposal. However, it was clear to both the Thomson and the LTV participants that the DOD response to Thomson's presentation was negative.

199. Thomson's approach was unacceptable to the working group because, according to Ms. Stewart, Thomson continued to discuss issues about active management and Special Security Agreements that were inconsistent with the DOD's communications.

200. After the meeting, Mr. Bell wrote to Ms. Stewart to suggest that the DOD set up a smaller working group comprised of individuals familiar with the Missiles Division's programs to review LTV's contracts and the nature and extent of COMSEC required to perform its contracts.

201. Ms. Stewart rejected that suggestion because, in her view, the working group as comprised had an adequate grasp of the Missiles Division's contracts and the working group was already in the process of reviewing the Missiles Division's contracts.

202. Thomson's and LTV's argument that the functions under the Missile Division's contracts requiring access to COMSEC were relatively minor and could be segregated from production was rejected by the Army and the National Security Agency[7] representatives on the working group. They determined that, even though only a relatively small portion of the effort under the Missiles Division's contracts required access to COMSEC, the COMSEC required to perform the Missiles Division's contracts could not be adequately safeguarded if Thomson were more than a passive investor. The working group considered this to be its decision to make and

it required no further input from Thomson or LTV.

203. After the May 7 DOD meeting, the DOD determined that the SSA as proposed by Thomson would be inadequate to protect the national security interests of the United States. Rather, the DOD maintained its position that a voting trust or proxy agreement would be required to adequately isolate foreign ownership and control of the Missiles Division.

### vii. The DOD Rejected Thomson's Proposed Proxy Agreement

204. On May 21, 1992, Thomson withdrew its SSA proposal and began to formulate a proposal for a proxy agreement which would allow Thomson to retain certain management control over aspects of the operations of the Missiles Division, such as control over mergers, acquisitions, and capital expenditures and the ability to select and determine the compensation of the chief executive officer.

205. Thomson understood that the issue of how much control it would be able to exercise over the Missiles Division under a proxy agreement was entirely dependent on the DOD's willingness to permit such control. Thomson also knew that the management rights it wished to retain were inconsistent with Deputy Secretary Atwood's admonition that a Thomson investment must be in the form of a passive investment. In view of this government mind set, there was nothing that LTV could do, or was asked to do, to assist Thomson in convincing the DOD to permit Thomson the degree of management control over the Missiles Division that Thomson sought.

206. By letter to Mr. Bell, Ms. Stewart informed Thomson that the working group determined that the management prerogatives that Thomson insisted on retaining were inconsistent with the DOD's view of a "passive investment" that would be necessary to isolate Thomson's ownership and control of the Missiles Division and to protect United States national security interests. Accordingly, the DOD rejected Thomson's proxy

---

7. The National Security Agency is the executive agent for COMSEC, charged with responsibility under DOD regulations for determining whether access to COMSEC would be appropriate under an SSA. (Industrial Security Regulations at § 2-205(e)(2) fn. 9).

proposal and determined "that a Voting Trust is required to negate foreign ownership control and influence."

207. Thomson was unwilling to enter into a voting trust as proposed by the DOD.

### viii. There Was Nothing LTV Could Have Done To Change The DOD's Decisions

208. LTV was not asked by the DOD to participate in the DOD's decision regarding an SSA, voting trust or proxy agreement. There was nothing that LTV could have done that would have changed the DOD's decision at any stage of the process. Rather, according to Ms. Stewart, the decision about what kind of security instrument would be used in the event Thomson's acquisition of the Missiles Division took place was solely a Defense Department decision and was driven by the nature of the information to which Thomson would require access to perform the Missiles Division's contracts. Indeed, Ms. Stewart believed that it would have been "inappropriate" for LTV to lobby the DOD in support of Thomson's proposals.

209. Accordingly, Thomson's failure to obtain an SSA or agree on a security mechanism with the DOD was an independent cause of its failure to consummate the acquisition of the Missiles Division under the Asset Purchase Agreement, which had nothing to do with any action or inaction on the part of LTV.

### ix. Thomson's Assertion That LTV Made Misrepresentations To Thomson And The Court Regarding The Security Classifications Of The Missiles Division's Contracts

210. Thomson asserts that LTV represented to Thomson prior to April 1992 that 5–7% of the Missiles Division's contracts required access to information classified as "other than secret." Thomson further asserts that Mr. Powers of LTV told this Court in April of 1992 that 75–80% of the Missiles Division's revenues required access to Proscribed Information. Thomson then asserts that the 5–7% representation was accurate and the 75–80% representation was inaccurate. In fact, both representations were accurate and consistent.

211. The record is clear that in 1991 Thomson representatives asked LTVAD's representatives about the percentage of Missiles Division revenues derived from contracts involving certain types of special access or so-called "black" programs. LTV told Thomson and other potential purchasers, both foreign and domestic, that approximately 5–7% of the Missiles Division's revenues fell into these categories. Prospective purchasers were interested in knowing the percentage of revenues attributable to black programs because they were prohibited by DOD regulations from receiving any information concerning these programs, including information necessary to enable them to evaluate the financial risks and rewards involved in such programs. At that time, Thomson and LTV did not discuss the percentage of Missiles Division revenues derived from contracts classified at the level of Secret or below requiring access to COMSEC or other Proscribed Information. Also, at that time, there were no discussions regarding the kinds of contracts which could or could not be covered by an SSA.

212. Thomson understood at the time that LTV provided the 5–7% estimate that this estimate applied to contracts entirely above Secret. Thomson also understood that contracts requiring access to Proscribed Information such as COMSEC may nonetheless be classified at a level of Secret or below. Moreover, Thomson knew at that time that the MLRS contract, the Missiles Division's largest contract, "probably" required access to COMSEC and that such contracts were not included in the 5–7% estimate.

213. In October of 1991, Ms. Madsen represented to Eileen Rousseau of the DIS that it appeared that none of the Missiles Division's programs required access to COMSEC information. Thomson never corrected this representation.

214. Prior to April of 1992, LTV had not analyzed the percentage of Missiles Division revenues which derived from contracts requiring access to COMSEC or other Proscribed Information. After reviewing the Andrews April 6 letter, which stated, *inter alia,* that an SSA will not permit the performance of contracts requiring access to Proscribed Information, including COMSEC, LTV performed an internal analysis of the

percentage of revenues derived from contracts requiring access to this information. Mr. Powers accurately testified that based on this internal review, 75–80% of the Missiles Division revenues were derived from contracts requiring access to COMSEC and other Proscribed Information. This 75% to 80% estimate included contracts classified at the level of Secret or below which required access to COMSEC information. LTV's internal review, upon which Mr. Powers based his testimony, was conducted after the DOD had given its 75–80% estimate to Thomson. The DOD's estimate and Mr. Powers' testimony were later independently confirmed by Thomson prior to execution of the Asset Purchase Agreement.

215. Moreover, Thomson had early access to a data room containing LTVAD's primary contracts and Form DD–254s. This access represented an opportunity to independently judge the security issues involved in the transaction. Given Thomson's sophistication in transactions involving security issues, it is surprising that Thomson would sign off on the Asset Purchase Agreement and the reverse break up fee without independently investigating the documents and without paying particular heed to the explicit, negative views of the government and relevant parties.

216. In sum, LTV's representation in August of 1991 that 5–7% of Missiles Division revenues derived from so-called black programs, and its representation in April of 1992 that 75–80% of the Missiles Division's revenues derived from contracts that required access to COMSEC or other Proscribed Information were both accurate.

B. *LTV Was Not Responsible For Thomson's Withdrawal Of Its CFIUS Application And LTV Could Not Have Done Anything Further To Secure CFIUS Approval Of The Thomson Transaction*

i. *Congressional And Public Opposition To A Thomson Acquisition Of The Missiles Division*

217. Although Congress had no formal role in reviewing Thomson's proposed acqui-

sition of the Missiles Division, members of Congress opposed to a Thomson acquisition of the Missiles Division could and did bring pressure on the Bush administration to exercise its powers under the Exon–Florio Amendment to prohibit the transaction.

218. In February and March of 1992, numerous members of Congress, including some of the most powerful and influential members on security and defense matters such as Sam Nunn and Les Aspin, the respective chairmen of the Senate and House Armed Services Committees, proclaimed their opposition to the prospect of a Thomson acquisition of the Missiles Division in a series of letters to President Bush, Secretary of Defense Richard Cheney and Deputy Secretary Atwood. The concerns expressed by these members of Congress were based primarily on (i) national security considerations, including the risk that sensitive technology would be transferred to France and then to hostile third world countries, (ii) defense industrial base concerns, such as the apprehension that American jobs might be lost because Thomson might subcontract work back to French aerospace companies or that American firms would be unable to compete on even terms with a Thomson-owned Missiles Division in light of French government control and suspected subsidization of Thomson, and (iii) concerns over whether American defense companies were becoming vulnerable to foreign government takeovers.

219. These concerns and Congressional opposition to Thomson's acquisition of the Missiles Division were widely publicized in the news media.

220. In addition to Congressional opposition, Thomson was aware prior to April of 1992 that certain present and former executive branch officials had a particular concern over the sale of a United States defense contractor to a foreign government-owned or controlled company because of the possibility for unauthorized technology transfers.[8]

221. As of April 1, 1992, Thomson was aware that these concerns with its proposed

---

8. Such concerns were influenced in part by the public disclosure of the former director of the

French Secret Service in the fall of 1991 that the French Secret Service had been engaged in an

acquisition had been publicly expressed and would be raised in opposition to its attempt to obtain approval for an acquisition of the Missiles Division.

222. After Thomson's bid was approved, members of Congress and the public continued to pressure CFIUS to investigate vigorously and to reject Thomson's proposed acquisition of the Missiles Division.

223. During the months after this Court approved Thomson's bid for the Missiles Division, several Congressional committees held hearings on the national security impact of such an acquisition and the CFIUS process. The hearings reflected continued Congressional concern over the transaction and put heavy political pressure on CFIUS to reject the transaction.

224. In addition, many influential members of Congress, including, among others, Senator Bentsen, Senator Nunn, Congressman Aspin, Senator Hollings and Senator Byrd, expressed increasingly strong hostility to a Thomson acquisition of the Missiles Division.

### ii. Thomson Withdrew Its CFIUS Application Because It Knew CFIUS Would Make A Negative Recommendation To The President

225. Despite the efforts of Thomson and LTV, most of the member agencies of CFIUS appeared to be opposed to Thomson's potential acquisition of the Missiles Division. The concerns of CFIUS members were apparent in their inquiries to Thomson and to LTV and were also expressed to Thomson by individuals close to the process.

226. Among the issues that were the subject of recurring inquiries posed to Thomson by CFIUS were concerns regarding:

a. Thomson's weapon sales and technology transfers to countries whose interests were not consistent with the interests of the United States;

b. Thomson's past compliance with United States industrial security laws and export laws governing technology transfer;

c. the French Government's influence over Thomson's internal policies and plans and its possible subsidization of Thomson's bid for the Missiles Division; and

d. the effect that a Thomson acquisition of the Missiles Division would have on the United States defense industrial base.

227. These same concerns were emphasized by CFIUS members at meetings held with Thomson and LTV representatives. Questions with respect to these subjects were directed to Thomson's representatives and responded to by Thomson. Few questions were directed to LTV representatives as the concerns raised by CFIUS related to issues that did not relate to LTV and were not within its knowledge. Thomson understood that LTV could do little or nothing to assist it with respect to these concerns.

228. Thomson was aware as early as May 19, from rumors within the White House, that Thomson might not be pleased about the eventual outcome of the CFIUS process.

229. In addition, General Brent Scowcroft, National Security Advisor to President Bush, informed Thomson representatives, in a meeting on June 9, 1992, that the proposed Thomson acquisition of the Missiles Division had resulted in the greatest amount of negative Congressional input that had ever been received by his office. General Scowcroft had previously expressed concern to Frank Carlucci, prior to April 1, 1992, over political problems that would be caused by a Thomson bid for the Missiles Division. The June 9 meeting with General Scowcroft was instrumental in convincing Thomson that it would have to seek a majority United States partner in order for Thomson to acquire any interest in the Missiles Division.

230. As time passed, Mr. Carlucci became increasingly concerned that CFIUS was going to make a negative recommendation to the President with respect to the Thomson transaction, based on information that the various constituent departments and agen-

extensive campaign of industrial espionage against United States companies. *See, French Government Spied Against U.S. Business, Report Says,* Assoc. Press, Sept. 13, 1991; Larry Rib-

stein, Christopher Dickey, Douglas Walter, *Parlez–Vous Espionage,* Newsweek, September 23, 1991, p. 40.

cies were almost all opposed to the transaction. Ultimately, he concluded that CFIUS would make a negative recommendation to the President.

231. Thomson withdrew its CFIUS application on July 6, 1992, because it anticipated that CFIUS would make a negative recommendation to the President.

232. Even if Thomson had negotiated a mutually acceptable security agreement with the DOD, its failure to obtain CFIUS approval would have precluded its acquisition of the Missiles Division.

233. In fact, Thomson withdrew from the transaction not because of its problems with the DOD, which might have been solved if it had agreed to a voting trust, but rather because it knew that it could not get CFIUS approval.

234. Thomson did not complain about LTV's performance with respect to CFIUS because LTV went to great lengths, both in the quality and quantity of its efforts, to try to help Thomson with CFIUS.

235. Accordingly, Thomson's failure to obtain CFIUS approval was an independent cause of its failure to consummate the acquisition of the Missiles Division under the Asset Purchase Agreement which had nothing to do with any action or inaction on the part of LTV.

### C. At No Time Did LTV Assist Martin Marietta Or Lockheed In Their Attempt To Impede The Sale Of The Missiles Division To Thomson

236. LTV did not actively support or assist, the efforts of Martin Marietta and Lockheed to defeat the sale of the Missiles Division to Thomson. In fact, LTV took steps to counteract Martin Marietta's "anti-Thomson" lobbying by conveying its belief to the press and to Congress that Thomson could be a successful owner of LTVAD.

237. Between approval of the sale of the Missiles Division to Thomson by this Court on April 10, 1992 and Thomson's termination of the Asset Purchase Agreement on July 28, 1992, any contacts between Missiles Division personnel and representatives of Martin Marietta and Lockheed were minimal and did not have the purpose or effect of subverting Thomson's acquisition.

238. LTV did not contact Martin Marietta or any other potential purchaser for the purpose of discussing a potential bid for the Missiles Division until after Thomson terminated the Asset Purchase Agreement on July 28, 1992.

### IV. LTV WAS NOT OBLIGATED, PURSUANT TO THE ASSET PURCHASE AGREEMENT, TO ASSIST THOMSON IN OBTAINING APPROVAL FROM THE DEPARTMENT OF DEFENSE OR TO LOBBY CONGRESS

#### A. The Asset Purchase Agreement

239. Pursuant to Section 7.01 of the Asset Purchase Agreement, the parties agreed to "use all reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under Applicable Law to consummate the transactions contemplated by this Agreement."

240. Section 7.01 sets forth examples of the type of actions that the parties contemplated would be necessary or desirable to consummate the transaction. Thus, Section 7.01 provides that the parties would "execute and deliver such other documents, certificates, agreements and other writings and ... take such other actions as may be reasonably necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement, including the Buyer's receipt of any amounts comprising or payable in respect of any Excluded Assets."

241. Section 7.01 is boilerplate language which was taken virtually in haec verba from the draft asset purchase agreement previously negotiated between LTV and Vought.

242. Where the parties intended for LTV to provide specific assistance in connection with Thomson's attempt to obtain government approvals, they did not rely on the general language of Section 7.01 but, rather, provided explicitly in the Asset Purchase Agreement for such specific assistance.

243. Thus, Section 7.05 of the Asset Purchase Agreement contains a provision specifically requiring the parties to promptly notify CFIUS of the contemplated transaction, cooperate with one another in furnishing information to CFIUS and to "use all reasonable efforts to do, or cause to be done, all things necessary or desirable to facilitate a favorable conclusion of any investigation by CFIUS."

244. In addition, Section 7.02 of the Asset Purchase Agreement explicitly required Thomson and LTV to "promptly complete and file all reports and forms, and respond to all requests or further requests for additional information, as may be required or authorized under the Hart–Scott–Rodino Act."

245. In contrast to the specific requirements concerning CFIUS and the Hart–Scott–Rodino Act, there is no provision in the Asset Purchase Agreement that requires LTV to assist Thomson's efforts to enter into a suitable security arrangement with the DOD.

246. Indeed, the only provisions in the Asset Purchase Agreement referring to a security arrangement with the DOD are Thomson's representation in Section 4.09 that it already had an agreement in principle with the DIS concerning the form and substance of an SSA [9] and Thomson's covenant in Section 6.04 to enter into such an agreement with the DOD.[10]

**B. Thomson Sought Specific Assurances Concerning Assistance With The DOD In Dealings With Hughes And Carlyle**

247. In contrast to the boilerplate reasonable efforts provision in the Asset Purchase Agreement, Thomson sought explicit assurances from both Hughes and Carlyle that each of them would assist it in negotiating a satisfactory security arrangement with the DOD.

248. Thus, in a draft memorandum of understanding submitted to Hughes in the fall of 1991, Thomson proposed a provision obligating Hughes to "take all necessary steps to assist Thomson–CSF in seeking ... (i) all necessary approvals for the consummation of the proposed acquisition such as but not limited to any authorization under the Hart–Scott–Rodino Act and Exon–Florio Amendment and (ii) any arrangement with the United States Department of Defence [sic] satisfactory to THOMSON with respect to the management of the Division operations."

249. Hughes, however, rejected the provision. Instead, the joint venture agreement between Thomson and Hughes, executed on March 31, 1992, did not obligate Hughes to assist Thomson in obtaining an agreement for a satisfactory security arrangement with the DOD.

250. Similarly, in negotiating a termination agreement with Carlyle in late February 1992, Thomson proposed that Carlyle agree to:

> use all reasonable efforts to assist Thomson in facilitating and promoting the acquisition of the assets of LTVAD's Missiles Division, including, but not limited to, meetings between Frank Carlucci and officials of the Department of Defense and appearances by Mr. Carlucci before the United States Bankruptcy Court, all as reasonably requested by Thomson.

251. That language was rejected by Carlyle because it did not want to obligate Mr. Carlucci to engage in activities based on Thomson's judgment as to what was appropriate rather than Mr. Carlucci's own judgment as to what was appropriate. In fact, Mr. Carlucci felt it was inappropriate for him to become involved in negotiations with the DOD.

---

9. Section 4.09 provides that Thomson believe[s] that [it has] reached an agreement in principle with the Defense Investigative Service concerning the terms and conditions of [a] final draft [of a Special Security Agreement] and [has] so advised the Defense Investigative Service. No representative of the Defense Investigative Service has expressed disagreement with this characterization.

10. In Section 6.04, Thomson covenanted to "enter into a special security agreement with the United States Department of Defense in substantially the form" that was attached as an exhibit to the Asset Purchase Agreement and that Thomson represented was the subject of an agreement in principle with the DIS.

252. Thomson did not propose, and the parties did not agree to, language in the Asset Purchase Agreement with LTV similar to the language that Thomson proposed to Hughes and to Carlyle for assistance with the DOD.

253. The absence of a specific provision in the Asset Purchase Agreement obligating LTV to assist Thomson with obtaining approvals from the DOD, Thomson's representation in the Asset Purchase Agreement that it had an agreement in principle with DIS, and the fact that Thomson specifically sought assurances from both Hughes and Carlyle (but not from LTV) that they would assist with DOD, demonstrate that the parties understood that LTV had no duty to assist Thomson in negotiations with the DOD for a mutually satisfactory security mechanism, although LTV did in fact do so.

254. The Asset Purchase Agreement also did not contain a clause specifically obligating LTV to lobby Congress. Indeed, the Asset Purchase Agreement makes no mention of Congress, which had no formal role to play in approving or disapproving the transaction.

255. The absence of a specific provision in the Asset Purchase Agreement obligating LTV to lobby Congress demonstrates the parties' understanding that LTV had no duty arising from the Asset Purchase Agreement to lobby Congress in support of the Thomson transaction, although LTV did in fact do so.

## V. TERMINATION OF THE ASSET PURCHASE AGREEMENT

256. By letter dated July 28, 1992, Thomson notified LTV that it would be unable to close the sale on July 31, 1992 and that it considered the Asset Purchase Agreement terminated.

257. Upon receipt of Thomson's letter informing LTV that Thomson considered the Asset Purchase Agreement to have been terminated, counsel to LTV wrote to Thomson's counsel demanding payment of the $20 million reverse break-up fee provided for under Section 6.06(a) of the Asset Purchase Agreement.

258. Thomson refused to pay the reverse break-up fee despite having agreed to pay it

in open court, despite having signed off on the Asset Purchase Agreement which provided for the fee and despite that the fee was a significant factor in the creditors' and the Court's decision to approve the sale to Thomson.

### CONCLUSIONS OF LAW

*Jurisdiction*

1. This Court has jurisdiction over this action as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Claims by a chapter 11 debtor for breach of a post-petition contract are essential to the "administration of the estate" and, therefore, are core proceedings under 28 U.S.C. § 157(b)(2)(A). *In re Ben Cooper, Inc.,* 896 F.2d 1394, 1400 (2d Cir.1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 126 (1991); *see also In re Arnold Print Works, Inc.,* 815 F.2d 165 (1st Cir.1987). This cause of action is also core, pursuant to § 157(b)(2)(O), because it arises out of the debtors' efforts to liquidate estate assets. *In re Arnold Print Works, Inc.,* 815 F.2d at 168. Additionally, section 157(b)(2)(N) provides the bankruptcy court with core jurisdiction over "orders approving the sale of property." It is well-settled that bankruptcy courts have core jurisdiction not only to enter such orders, but to enforce them. *See, e.g., In re Marcus Hook Development Park, Inc.,* 943 F.2d 261 (3d Cir.1991); *Comco Associates & SPA 77k L.P. v. Faraldi Food Indus. Ltd.,* 170 B.R. 765 (E.D.N.Y.1994). Since the application for the Sale Order was a core proceeding and LTV's First Claim for Relief is based on a violation of the Sale Order, this action is a core proceeding under § 157(b)(2)(A), (N) and (O). This conclusion is further supported by the fact that this Court expressly retained jurisdiction over any dispute or action in connection with the Sale Order.

2. As a threshold matter I note that, in order to provide stability and finality to judicial sales of a debtor's assets pursuant to section 363 of the Bankruptcy Code, successful bidders are bound and obligated to consummate the sale when it is authorized by the bankruptcy court. *In re Oyster Bay Cove, Ltd.,* 161 B.R. 338, 342 (Bankr.

E.D.N.Y.1993); *In re Mann*, 45 B.R. 755 (Bankr.S.D.Ohio 1985). *See also, In re Winston Inn & Restaurant Corp.*, 120 B.R. 631, 635 (E.D.N.Y.1990) ("To induce bidding at such sales and reliance upon them, the purpose of the law is that they shall be final.") Thus, the successful bidder at a bankruptcy sale is bound by the offer as stated and as embodied in an approval order. *In re Silver Bros. Co., Inc.*, 179 B.R. 986, 1007 (Bankr. D.N.H.1993). This is especially so because judicial sales, unlike ordinary private commercial transactions, involve parties other than the particular parties to the transaction. *Id.* at 1007. To allow a purchaser to bid before a court, to have lienholders and other creditors agree to the bid and then have purchasers renege upon further inquiry into the nature of the property,

> would interject an intolerable element of uncertainty and inequity into judicial sales. It would give an advantage to those who blithely bid in ignorance at the expense of those who have made more careful inquiry.... Moreover, it could deprive the debtor and lienholders of the benefit of an offer made by a more serious bidder.

*In re Winston Inn & Restaurant Corp.*, 120 B.R. at 637.

Despite this, Thompson argues that because LTV failed to employ reasonable efforts in consummating the transaction, Thomson should not be bound by its agreement to pay the $20 million reverse break-up fee in the event it failed to obtain the requisite approvals. Based upon all of the evidence, I disagree.

3. Under New York law, an implied covenant of good faith and fair dealing inheres in every contract. *Travellers Intern., A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570 (2d Cir.1994) (citing *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*, 30 N.Y.2d 34, 45, 330 N.Y.S.2d 329, 333, 281 N.E.2d 142, 144 *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972)). Simply stated, the burden imposed is that neither party will do anything that will injure the right of the other to receive the benefits of the agreement. The implied covenant imposes upon each party an obligation to do everything

that the contract presupposes the party will do to accomplish the contract's purpose. The boundaries set by the duty of good faith are generally defined by the parties' intent and reasonable expectations in entering the contract. *Cross & Cross Properties, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir.1989). In attempting to construe the contracting parties' intent fairly and reasonably, a court must consider the specific language of the contract and the context within which that contract was formed. *Id.*

4. Good faith is also a factor in the determination of whether a party has fulfilled its obligations under a "best efforts" clause. *See, Proteus Books Ltd. v. Cherry Lane Music Co.*, 873 F.2d 502, 508–09 (2d Cir.1989); *Zilg v. Prentice–Hall, Inc.*, 717 F.2d 671, 680–81 (2d Cir.1983) *cert. denied*, 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984); *McDarren v. Marvel Entertainment Group, Inc.*, 1995 WL 214482 (S.D.N.Y. April 11, 1995). By using the term "reasonable efforts" in Section 7.01 of the Asset Purchase Agreement the parties necessarily intended to impose a lesser obligation than would have been required had they chosen to use the term "best efforts"—as they did elsewhere in the Agreement (Asset Purchase Agreement at § 5.01(b)(iv) and 2.05(b)). However, even a best efforts clause permits parties a degree of discretion in the selection of a plan of action and allows them to rely on their good faith business judgment as to the "best way" to achieve the desired result. *Western Geophysical Co. of America, Inc. v. Bolt Associates, Inc.*, 584 F.2d 1164, 1171 (2d Cir.1978). A best efforts clause "does not strip the promising party of its right to give reasonable consideration to its own interests." *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614 (2d Cir.1979) (citing *Van Valkenburgh v. Hayden Publishing Co.*, 30 N.Y.2d at 46, 330 N.Y.S.2d at 334, 281 N.E.2d at 145). Accordingly, to prevail upon its contention that a party has failed to use its best efforts, the movant must show that the nature and extent of the opposing party's efforts did not reflect good faith business judgments. *Travellers Intern., A.G. v. Trans World Airlines, Inc.*, 41 F.3d at 1575–76. While a best efforts clause requires good

faith activity in light of the party's own capabilities and expertise, once such activity is demonstrated, it is clearly erroneous for a court to speculate as to what other steps the party should have taken. *Triple-A Baseball Club Associates v. Northeastern Baseball, Inc.*, 832 F.2d 214, 227–28 (1st Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988).

▮ Applying these legal standards to all of the evidence adduced at trial, LTV is entitled to judgment.

5. Section 7.01 of the Asset Purchase Agreement provides that "each party will use all reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under Applicable Law to consummate the transactions contemplated by [the Asset Purchase Agreement]." LTV satisfied this obligation by taking the following actions:

a) Missiles Division personnel expended a tremendous amount of time and effort accomplishing the tasks necessary to close by July 31, 1992.

b) Missiles Division personnel provided Thomson with information crucial to the presentation of Thomson's proposed SSA to the DOD.

c) LTV assisted Thomson in its May 7 presentation to the DOD.

d) LTV continued to assist Thomson with its DOD efforts even after Thomson withdrew its SSA proposal.

e) LTV expended a tremendous amount of time and effort to assist Thomson in obtaining a favorable CFIUS determination.

f) LTV expended a tremendous amount of time and effort assisting Thomson with Congressional lobbying and public relations.

g) LTV assisted Thomson in connection with Thomson's efforts to structure an alternative transaction that would satisfy the DOD and CFIUS.

6. Section 7.01 of the Asset Purchase Agreement did not require LTV to lobby members of Congress to change their opinions with respect to Thomson's acquisition or to take actions that would alienate the DOD,

such as contacting program managers in violation of the DOD's directive or insisting that the DOD accept a security mechanism that the DOD had rejected. LTVAD's decision not to take such actions constituted a good faith business judgment that such actions would be adverse to its business.

7. Section 7.01 read in conjunction with Section 6.04 of the Asset Purchase Agreement clearly placed the burden of negotiating an SSA with the DOD on Thomson, not LTV.

▮ 8. Section 7.01 did not impose an obligation on LTV to undertake every action suggested by Thomson any more than it required Thomson to undertake every action suggested by LTV. Reasonable efforts do not require one party to cede its business judgment to another party.

9. LTV did not make any misrepresentations to the DOD, the DIS, the Army or Congress regarding the extent to which access to COMSEC is required for Missile Division contracts. Accordingly, LTV had no duty to "correct" any of the representations it made in this regard.

10. Thomson's assertion that LTV's conduct bars it from recovering the reverse break-up fee is without merit. Based on its above-stated Findings, the Court concludes that LTV did not act in bad faith in its dealings with Thomson, the government or this Court during the course of the sale of LTVAD's assets.

▮ 11. Further, LTV did not conceal any material facts or make any misrepresentations to Thomson.

a) LTV's representation in 1991 that 5–7% of its revenues were derived from black programs and its representation in April 1992 that 75–80% of the Missiles Division's revenues required access to COMSEC and other Proscribed Information were both accurate.

12. Moreover, the precise information regarding the level of COMSEC which Thompson complains was not provided was easily found by looking at the DD–254 forms attached to each of LTVAD's contracts. As noted by one of Thompson's own advisors, these forms should have been looked at as part of Thompson's due diligence. Addition-

ally, despite the increasingly negative signals from various governmental entities and representatives that developed after the April 8 hearing and despite the admonition that such developments should be considered prior to executing the Asset Purchase Agreement, Thompson nevertheless went forward with the execution of the Agreement.[11]

In discussing the issue of misrepresentation sufficient to vitiate a contract of sale, the Supreme Court in *Slaughter's Administrator v. Gerson,* 80 U.S. 379, 13 Wall. 379, 20 L.Ed. 627 (1871), explained that a court of equity will not undertake, any more than a court of law, to relieve a party from the consequences of its own carelessness where the means of knowledge are at hand and subject to the purchaser's inspection. Specifically, the Court stated that

> If, having eyes, he will not see matters directly before them, [sic] where no concealment is made or attempted, he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and been misled by overconfidence in the statements of another.

80 U.S. (13 Wall.) at 383; *see also,* Jaeger, 12 *Williston on Contracts,* § 1499A, p. 398 (3d ed. 1993) ("A person has no right to shut his eyes or ears to avoid information, and then assert that he had no notice.... He may not remain wilfully ignorant of a thing readily ascertainable."). Here, Thompson stubbornly believed, despite all of the signs to the contrary, that with its team of highpowered and influential advisors, it could acquire the Missiles Division on its own terms.

b) Further, LTV did not conceal from Thomson the fact that government representatives had told LTV, prior to April of 1992, that Thomson would not obtain the necessary DOD approvals. LTV told Thomson prior to the execution of the Asset Purchase Agreement that based on numerous government communications, it did not believe Thomson would obtain DOD approval. Moreover, Thomson knew, prior to the execution of the

Asset Purchase Agreement, that there was substantial opposition by the DOD to the transaction and that the DOD would not grant Thomson an SSA.

c) When LTV represented that it would exercise reasonable efforts to consummate the transaction it intended to, and in fact did, exercise reasonable efforts. It did not intend to and did not pursue a policy of neutrality.

13. Moreover, LTV's initial support for the Vought bid was based on its assessment that Thomson would be unable to obtain the necessary government approvals. LTV's initial support for the Vought bid did not require LTV to, in effect, disavow the testimony by Mr. Powers at the April 8 hearing. LTV's actions prior to the execution of the Asset Purchase Agreement did not create a duty beyond that set forth in the language of Section 7.01.

14. Accordingly, on July 31, 1992, Thomson had no independent right not to proceed with the closing of the purchase of the assets of the Missiles Division for reasons not related directly or indirectly to Thomson's failure to (i) obtain approval from the DOD for an SSA substantially in the form annexed to the Asset Purchase Agreement and (ii) obtain a favorable result from CFI-US.

15. Accordingly, by virtue of its failure to close the transaction, Thomson is obligated to pay to LTV $20 million pursuant to the terms of Section 6.06(a) of the Asset Purchase Agreement.

16. Thomson's assertion that LTV is not entitled to the reverse break-up fee because LTV has been unjustly enriched, fails as a matter of law.

The equitable doctrine of unjust enrichment rests, generally, on the principle that a party should not be allowed to enrich himself at the expense of another. *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 263 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984) (citing *Miller v.*

---

11. I make no finding as to whether, based upon this Court's approval of the Thompson bid at the hearing on April 8, Thompson would be liable for the payment of the reverse break-up fee regard-

less of whether the Asset Purchase Agreement was subsequently executed. *See, In re Winston Inn & Restaurant Corp., supra.*

*Schloss,* 218 N.Y. 400, 113 N.E. 337 (1916)). Under New York law, a party seeking an equitable recovery based on unjust enrichment must first show that a benefit was conferred upon the other party, and then show that, as between the two parties, enrichment of the other party was unjust. *Id.* (citing *Indyk v. Habib Bank, Ltd.,* 694 F.2d 54, 57 (2d Cir.1982)). Clearly, payment of the reverse break-up fee would not result in unjust enrichment on the part of LTV. This Court approved the Thomson bid as the winning bid, notwithstanding the uncertainties extant at that time regarding Thomson's ability to obtain the requisite government approvals, in large part because Thomson agreed to pay the fee in the event it failed to obtain those approvals. The $20 million constituted a hedge against that uncertainty, as it was intended to by the parties, and was an intrinsic part of this Court's decision to approve the Thompson bid. *See, Thomson,* 155 B.R. at 640. Thus, as this Court previously determined, Thomson is estopped from now claiming that the $20 million reverse break-up fee is inequitable or an unenforceable penalty. *Id. See also, e.g., Meyerson v. Werner,* 683 F.2d 723 (2d Cir.1982) (Court of Appeals applied federal law of estoppel to preclude party to settlement agreement negotiated and approved in open court from contending that a stipulated amount, agreed to be paid by one party in the event of such party's default, was an unenforceable penalty).

██ Moreover, to invoke equity requires the indispensable ingredient that between the two parties there must be an injustice. *Indyk v. Habib Bank, Ltd.,* 694 F.2d at 58. Based upon all of the evidence presented in this case, that ingredient, among others, is clearly missing.

██ Further, whether payment of the reverse break-up fee would cause LTV to recover more than its actual damages, as Thomson argues, is clearly irrelevant as a matter of New York law:

> Under New York law ... the actual damages suffered by the party for whose benefit the clause is inserted in the contract have little relevance to the validity of a liquidated damages clause. The soundness

of such a clause is tested in light of the circumstances existing as of the time that the agreement is entered into rather than at the time that the damages incurred or become payable.... It thus makes no difference whether the actual damages are higher or lower than the sum stated in the clause....

*United Merchants and Mfrs., Inc. v. Equitable Life Assur. Society of the U.S. (In re United Merchants and Mfrs., Inc.),* 674 F.2d 134, 142 (2d Cir.1982) (quoting *Walter E. Heller & Co., Inc. v. American Flyers Airline Corp.,* 459 F.2d 896, 898–99 (2d Cir. 1972)) (citations and footnotes omitted in original).

17. In sum, Thomson's failure to pay the $20 million reverse break-up fee constitutes a breach of Section 6.06(a) of the Asset Purchase Agreement.

18. Thomson's failure to pay the $20 million reverse break-up fee constitutes a violation of the Sale Order.

19. Pursuant to CPLR §§ 5001 and 5004, LTV is entitled as a matter of law to receive prejudgment interest on $20 million from August 1, 1992 at the rate of 9% per annum. Alternatively, the Court concludes, in its discretion, that LTV is entitled to such prejudgment interest.